## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MARKELLE SETH,** ) | |
| **Old North Carolina Highway 75** ) | |
| **Butner, N.C. 27509** ) | |
| ) | **CIVIL ACTION NO:** |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | |
| ) | |
| **The DISTRICT OF COLUMBIA,** ) | |
| **Karl A. Racine, Attorney General** ) | |
| **Office of the Attorney General** ) | |
| **441 4th Street, N.W., Suite 630 South** ) | |
| **Washington, D.C. 20001** ) | |
| ) | |
| **The D.C. DEPARTMENT ON DISABILITY** ) | |
| **SERVICES,** ) | |
| **250 E Street, S.W.** ) | |
| **Washington, D.C. 20024, and** ) | |
| ) | |
| **ANDREW REESE, in his** ) | |
| **official capacity as Director of the D.C.** ) | |
| **Department on Disability Services,** ) | |
| **250 E Street, S.W.** ) | |
| **Washington, D.C. 20024** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

## COMPLAINT

Markelle Seth, by and through his attorneys, brings this Complaint against the District of

Columbia; the D.C. Department on Disability Services ("DDS"); and Andrew Reese, in his

official capacity as Director of DDS for violating Title II of the Americans with Disabilities Act

of 1990, 42 U.S.C. § 12131 *et seq.* ("ADA"), Section 504 of the Rehabilitation Act of 1973, 29

U.S.C. § 794(a) ("Section 504"), the D.C. Human Rights Act of 1997, D.C. Code § 2-1401.01 *et*

*seq.* ("DCHRA"), and the Citizens with Intellectual Disabilities Civil Rights Restoration Act of

2015, D.C. Code § 7-1301.01 *et seq*. ("CIDA").

## I.   INTRODUCTION

1.      Markelle Seth ("Markelle") is a D.C. resident with intellectual disability[1] currently in federal prison despite not having been convicted of any crime, in violation of his right under state and federal law to receive services and treatment in the most integrated setting appropriate to his needs. The District of Columbia, by and through   DDS[2], the agency responsible for providing services to D.C. citizens with intellectual and developmental disabilities, has abandoned Markelle—a young man found by a judge of this Court to have "the auditory comprehension of a first-grade student"—leaving him to languish in a federal prison in North Carolina.

2.      Markelle has now endured over three years of confinement in local and federal

---

[1]   Plaintiff uses the term "intellectual disability" in place of "mental retardation" except when directly quoting others or referencing names of organizations.  Although the latter term appears in some evidence, case law, and statutory language, it is offensive to many persons and has been replaced by more sensitive and appropriate terminology.  *See* Rosa's Law, Pub. L. No. 111-256, 124 Stat. 2643 (changing entries in the U.S. Code from "mental retardation" to "intellectual disability"); *Hall v. Florida*, 134 S. Ct. 1986, 1990 (2014) ("This opinion uses the term 'intellectual disability' to describe the identical phenomenon.  This change in terminology is approved and used in the latest edition of the Diagnostic and Statistical Manual of Mental Disorders, one of the basic texts used by psychiatrists and other experts." (citations omitted)); Robert L. Schalock et al., *The Renaming of Mental Retardation: Understanding the Change to the Term Intellectual Disability*, 45 Intellectual & Developmental Disabilities 116 (2007). This complaint also uses person-first language, describing the person before the disability, consistent with D.C. Code § 2-632 (the People First Respectful Language Modernization Act of 2006).

[2]   All references to DDS refer to DDS, its Director, Andrew Reese, and the District of Columbia.  DDS is acting on behalf of the District of Columbia as the government agency charged with providing services for D.C. citizens with intellectual and developmental disabilities.

jails and prisons, despite Defendants' legal obligation and explicit promise to provide services and treatment to Markelle via civil commitment pursuant to the D.C. statute that governs situations exactly like this one, and corresponding federal law obligations to accommodate Markelle's disability in the most integrated setting appropriate.

3.      Indeed, DDS's *own* retained expert stated that Markelle can and should be returned to the District, where he can be placed in a supervisory program without posing a danger to himself or others.  DDS—ignoring its own expert's recommendation—has reneged on its legal commitment to do so, despite having both the legal obligation and practical capacity to do so.  As such, Markelle must be removed from the dangerous, segregated, damaging, and non-habilitative environment of federal prison and returned to his home state.

4.      Because of his disability, Markelle is entitled, under federal and D.C. law, to receive from Defendants disability-related services in the most integrated setting appropriate for him in his home community.  Defendants provide these services to other D.C. residents and they can be provided consistent with the requirements of public safety.  Defendants' actions violate the ADA, Section 504, DCHRA, and CIDA, and should be enjoined.

5.      In late 2014, when Markelle was twenty years old, he was charged in this Court with sexual offenses involving children who lived in his household.  The Court recognized that Markelle is an individual with intellectual disability and ordered a series of evaluations to determine his competency to stand trial.  While those evaluations were pending, Markelle, through his counsel, applied to DDS for disability-related services.  That request sought to ensure that, if Markelle were found by the court to be incompetent to stand trial and unlikely to be restorable to competency, he could be considered for appropriate services in the most integrated setting appropriate in his community via the District of Columbia's civil commitment

3

mechanism, rather than remain in prison without having been convicted of a crime.

6.      In 2015, DDS began a comprehensive evaluation of Markelle. Based on his well-documented history of disability, he was found eligible for services. The agency identified and referred him to an existing DDS service provider, which accepted him and began to develop a program to provide him with services and treatment in the community. DDS later retained an expert to determine if the recommended program could properly meet Markelle's needs while protecting the safety and security of the community. During that process, which extended through 2016, DDS repeatedly and unequivocally informed Markelle and his counsel, in writing and orally, that it planned to commence civil commitment proceedings in order to provide him with community-based services[3] through a selected provider under D.C. law, if and when this Court were to conclude that Markelle was incompetent to stand trial on the pending criminal charges.

7.      DDS identified an appropriate structure and plan for comprehensive habilitative services in the community that would meet both Markelle's needs and the needs and interests of the community. DDS's expert issued a series of detailed reports containing a comprehensive plan to both serve and supervise Markelle outside of correctional facilities and within existing programs with which DDS has contracted for services for other individuals with intellectual

---

[3]      CIDA defines "community-based services" as "non-residential specialized or generic services for the evaluation, care and habilitation of persons with intellectual disabilities, in a community setting, directed toward the intellectual, social, personal, physical, emotional or economic development of a person with an intellectual disability. Such services shall include, but not be limited to, diagnosis, evaluation, treatment, day care, training, education, sheltered employment, recreation, counseling of the person with an intellectual disability and his or her family, protective and other social and socio-legal services, information and referral, and transportation to assure delivery of services to persons of all ages who have intellectual disabilities." D.C. Code § 7-1301.03(5).

disability charged with sexual or other serious offenses.

8.    In late 2016, based on multiple evaluations described below, this Court found that Markelle was not competent to stand trial due to his intellectual disability and that there was no reasonable likelihood that he would ever become competent to stand trial.  At that point, DDS should have, as it had promised to do pursuant to D.C. law, begun civil commitment proceedings in the D.C. Superior Court.

9.    Instead, DDS reneged on its prior explicit commitments, ignored the recommendations of its own expert, and abdicated its legal responsibility to Markelle.  As a result, Markelle is currently being held in a federal prison in North Carolina even though he has not been and cannot be convicted of the crime for which he was charged.  A petition for *federal* civil commitment has been filed in the Eastern District of North Carolina which, if granted, will result in indefinite incarceration of Markelle in the Federal Bureau of Prisons ("BOP").

10.    During his federal incarceration, Markelle has cycled back and forth between the prison's general population and confinement in near 24-hour-per-day administrative or disciplinary "segregation" because his intellectual disability makes it challenging for him to follow institutional rules, leading authorities to frequently discipline him by placing him in solitary confinement.

11.    DDS's continued failure to act by initiating civil commitment in the District of Columbia where he could receive the habilitative services to which he is entitled, leaves Markelle facing the prospect of *federal* civil commitment—including regular solitary confinement—in a federal prison in North Carolina for the foreseeable future, if not for the rest of his life.

12.    Authorities for the BOP have stated that they would send Markelle back to the

District of Columbia, as they are required to do by statute, if the appropriate local agency were prepared to take responsibility for his care and treatment.

13.     DDS has both a mandate and the capacity to provide Markelle with the services and supports he needs to be successful in the community.  DDS's own retained expert has recommended it do so in this case, and it has created specific plans for the care and custody of Markelle.  However, due to DDS's refusal to act and its dereliction of its statutory mandate, Markelle remains far from home, in a federal prison, cut off from those who care about him, and deprived of services in the most integrated setting appropriate, to which he is entitled.  His civil rights are being violated, his mental and physical health are being damaged, and indeed, his safety and future are at risk.

14.     Upon information and belief, the District of Columbia regularly provides community-based supervisory services to D.C. residents who are found not competent to stand trial due to mental illness through the Department of Behavioral Health, but is failing to do so for those with intellectual disability, such as Markelle.  D.C. law provides dual mechanisms to civilly commit citizens who are found not competent to stand trial for one of two reasons: mental illness or intellectual disability.  The District freely serves the former group, citizens found not competent to stand trial with a primary diagnosis of mental illness, pursuant to the Ervin Act, Mental Health Civil Commitment Act of 2002, D.C. Code § 21–501 *et seq.* ("Ervin Act"), which charges the District's Department of Behavioral Health with this responsibility.  The Ervin Act's counterpart, CIDA, similarly charges DDS with providing services for citizens with intellectual disability found not competent to stand trial due to their intellectual disability.  Despite having both the resources to serve these citizens and a statutory mandate to do so, DDS has failed to act for Markelle.

15.     DDS is expressly tasked with serving individuals in Markelle's situation, even in cases where a person presents a risk to themselves or others.  Indeed, CIDA specifically provides that *only* individuals who present the highest level of risk (defendants charged with a crime of violence or a sex offense) meet the criteria for civil commitment.  The statute thus charges DDS with responsibility for a challenging population.  It has no basis to avoid this mandate in Markelle's case, particularly when DDS's expert has concluded that DDS can serve Markelle in an integrated fashion in the community with appropriate supports and without undue risk.

16.     Finally, the remedy sought here is appropriate because civil commitment is primarily a state, not a federal, function.  Federal civil commitment exists only as a last resort for dangerous individuals for whom no state provision for care and custody exists.  D.C. civil commitment allows for the provision of person-centered services and supports in the community, while federal civil commitment is akin to a lifelong prison sentence.  Moreover, because DDS is able to care for and supervise Markelle, its failure to do so violates federal and D.C. law, and it cannot abdicate its responsibility to the federal government.

## II.     PARTIES

17.     Plaintiff Markelle Seth is an individual with intellectual disability currently confined to federal custody at Federal Medical Center ("FMC") Butner after being found incompetent to stand trial and not capable of being returned to competency.  Markelle is a resident of the District of Columbia.

18.     Defendant District of Columbia is the jurisdiction that oversees DDS, a city government agency.

19.     Defendant DDS is the D.C. government agency responsible for providing information, approval, placement, oversight and coordination, and funding for services to people

with intellectual disability in the District.

20.     Defendant Andrew Reese is the Director of DDS.  In this role, Defendant Reese oversees the administration of the agency.

21.     Whenever Plaintiff uses the word "Defendants" in this Complaint, he means all Defendants, their agents, employees, and all those acting in concert with them or at their direction.

### III.     JURISDICTION AND VENUE

22.     This Court has general jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (federal question jurisdiction).  This court has supplemental jurisdiction to consider state law claims under 28 U.S.C. § 1367.

23.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

### IV.     FACTS

**A. Markelle Has Experienced Instability, Trauma, and Intellectual Disability.**

24.     Markelle was born on November 29, 1993, and raised in the District.  He was removed from his mother's care through neglect proceedings commenced in D.C. Superior Court when he was three months old.  When child protective services took custody of Markelle, he weighed less than he did at his birth.  He was then placed in St. Ann's Infant Home, an orphanage, rather than a family home.  Markelle spent time in two separate foster care homes before he was placed with his father in 1997, at the age of three.

25.     Markelle experienced childhood seizures from infancy until he was about six years old.  Markelle had significant delays in reaching developmental milestones, including not being able to sit up on his own until age four and not being able to crawl until age five.  He also

had significant speech delays and was provided with speech and physical therapy.

26. Markelle also experienced significant challenges in school. He was identified as having a disability and placed in special education classes during elementary school. He was bullied by other students because of his disability. At some point during his attendance in a D.C. Public School, Markelle received an Individualized Education Program ("IEP") that focused on supporting his learning activities across a broad array of areas, including math, reading, and writing, providing speech and language services, and behavioral supports.

27. For middle school and high school, Markelle was placed in Options Public Charter School ("Options"), a notoriously dysfunctional, segregated special education school in the District. In twelfth grade, Markelle's standardized testing scores reflected math skills at a fourth-grade level, reading skills at a second-grade level, and writing skills at a first-grade level.

28. The school deemed Markelle unable to earn a high school diploma and placed him on the certificate track. Although the federal Individuals with Disabilities Education Act entitled him to receive a full complement of special education services until he turned twenty-two, Options encouraged Markelle to leave school at age eighteen. This action deprived him of his full special educational entitlement, as Markelle stopped receiving all services when his time at Options ended.

**B. Markelle Is an Individual with Intellectual Disability.**

29. As defined by the American Association on Intellectual and Developmental Disabilities ("AAIDD") and adopted by the District of Columbia, the definition of intellectual

disability has three prongs: 1) significantly impaired intellectual functioning;[4] 2) adaptive behavior deficits in conceptual, social, and/or practical skills; and 3) onset of the disability before age eighteen.   AAIDD, *Definition of Intellectual Disability*, http://aaidd.org/intellectual-disability/definition*; see* D.C. Code § 7-1301.03(2), (15A).

30.     DDS expressly found on April 17, 2015, that Markelle meets all three criteria for intellectual disability and is eligible for its services.

31.     Markelle receives federal Supplemental Security Income benefits based on his disability, and he has been evaluated and found eligible for services as an adult with intellectual disability by Defendant DDS.   Multiple evaluations over many years have confirmed this diagnosis.   In finding him incompetent for trial, *see infra* paras. 37-40, a judge of this Court found that Markelle's full scale IQ "hovers somewhere between fifty-three and sixty-five, landing at the bottom one percent of his age group regardless of where in that range it falls."[5]  Exhibit 1, Magistrate Judge Harvey's Report and Recommendation at 33, *United States*

---

[4]   An IQ of approximately 70 – 75 or lower demonstrates significant impairment of intellectual functioning.  *See* AAIDD, *Intellectual Disability: Definition, Classification, and System of Supports* (11th ed. 2010) (Classification Manual); American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2013).   The U.S. Supreme Court has rejected arbitrary cutoffs for IQ scores in making the intellectual disability determination, stating that "intellectual disability is a condition, not a number.   Courts must recognize, as does the medical community, that the IQ test is imprecise," *Hall*, 134 S. Ct. at 2001, and the standard error of measurement "means that an individual's score is best understood as a range of scores on either side of the recorded score." *Id.* at 1995.  Markelle's IQ score range of 53 – 65, *see supra* para. 31, unequivocally meets the first prong of the definition of intellectual disability.

[5]   Magistrate Judge Harvey's conclusions were adopted without objection from either party by Chief Judge Beryl Howell on December 22, 2016.   Order, *United States v. Seth*, No. 14-mj-608 (BAH/GMH) (D.D.C. Dec. 22, 2016) (Dkt 77).

*v. Seth*, No. 14-mj-608 (BAH/GMH) (D.D.C. Dec. 1, 2016) (Dkt 75) (hereinafter "Magistrate's Report").

**C.  Markelle Was Arrested and Charged but This Court Determined Markelle is Not Competent to Stand Trial.**

32.     In October 2014, Markelle was arrested and later charged in the U.S. District Court for the District of Columbia with one count of production of child pornography for allegedly using his cell phone to videotape two children in his household engaging in sexual behavior with him, in violation of 18 U.S.C. § 2251(a).

33.     Shortly following his arrest, competency proceedings were initiated due to Markelle's obvious intellectual disability.  Although a criminal complaint was filed in federal district court, the government ultimately did not seek an indictment.

34.     Markelle was sent to a Federal Bureau of Prisons facility in New York for the competency evaluation.  The BOP psychologist concluded he was incompetent to stand trial, which neither the defense nor prosecution disputed.  In accordance with the federal statute, after being returned to the District, Markelle was next sent to a BOP facility in Butner, North Carolina, for an opinion on whether he could be "restored" to competence.

35.     This series of transitions from the District to New York, back to the District, and then on to North Carolina was extremely hard for Markelle, who faces challenges to functioning successfully in a correctional environment under the best of circumstances.  As described more fully herein, he spent virtually the entire period of the two BOP competency evaluations in solitary confinement.

36.     Markelle was also physically harmed while in the District's custody during the interval between those evaluations.  During a search of his cell at the D.C. Jail, Markelle

11

protested and became upset when correctional officers touched his belongings. The officers responded with physical force and fractured his skull, which required sutures. Following intervention from counsel, Markelle was moved to the Correctional Treatment Center. There he was provided special housing on a medical unit with older and physically unwell prisoners in an effort to keep him safe.

37.     After a four-month incarceration at FMC Butner during which the BOP undertook to restore Markelle to competence, he was returned to the District. Following a contested evidentiary hearing, Magistrate Judge G. Michael Harvey decided that Markelle "lacks the capacity to understand, think through, and answer even the most basic questions about the legal process and the case against him." Magistrate's Report at 37. The Court concluded that due to "an incurable deficiency in oral comprehension and mental processing," Markelle is "incapable of being restored to competency for the foreseeable future." *Id.* at 39-40.

38.     The court found Markelle "has consistently demonstrated that he has the auditory comprehension of a first grade student" and that "having [him] stand trial would be akin to putting a seven-year-old in the courtroom and expecting them to understand the language, ideas, and theories likely to be discussed." *Id.* at 39. During the hearing, Markelle was engrossed in coloring books, sticker books, word searches, and dot-to-dot activities. The Court noted that Markelle at times would "cover[] his ears as if to prevent himself from hearing testimony that he did not like, [behavior] that suggests he lacks a rational understanding of how to contribute to his defense and conduct himself in a courtroom." *Id.* at 26, 38.

39.     After a two-day evidentiary hearing, during which both sides presented evidence and experts, Magistrate Judge Harvey issued a Report and Recommendation on December 1, 2016, finding Markelle incompetent to stand trial and not restorable to competency in the

foreseeable future.

40.     On December 22, 2016, Chief Judge Beryl Howell issued an order adopting Magistrate Judge Harvey's Report and Recommendation. Chief Judge Howell also remanded Markelle into the Attorney General of the United States' custody pursuant to 18 U.S.C. § 4246, the federal civil commitment statute, for purposes of psychological examination to determine if Markelle's release would create a risk of substantial bodily injury or harm to another person. Markelle was transferred back to FMC Butner. Order, *Seth*, No. 14-mj-608 (BAH/GMH) (Dec. 22, 2016) (Dkt 77).

41.     Markelle remains at FMC Butner pending his 18 U.S.C. § 4246 civil commitment hearing.

### D. DDS Initially Agreed to Place Markelle in a Community-Based Program and Took Significant Steps in Furtherance of That Commitment.

42.     On February 13, 2015, prior to his first competency hearing, Markelle's defense lawyers applied to DDS for support and services because incarceration is an inappropriate and harmful placement for Markelle. DDS's then-Director, Laura Nuss, soon acknowledged Markelle's eligibility for services and the agency's duty to provide them to him through the civil commitment process.

43.     On March 12, 2015, Director Nuss confirmed that a favorable eligibility determination was forthcoming and that DDS would proceed with civil commitment. She wrote, "I encourage you to continue working with DDS and DDS/DDA[6] staff identified in the emails

---

[6]   DDS is composed of two administrations that are tasked with overseeing and coordinating services for residents with disabilities through a network of private and non-profit providers:

below to develop a person-centered approach to supporting MS [Markelle Seth] in the context of the court proceedings and the formal commitment process.  I am copying our General Counsel to ensure that we move forward together on MS's behalf."

44.     On March 13, 2015, DDS's General Counsel, Mark Back, likewise acknowledged that DDS planned to move for civil commitment of Markelle in order to remove him from federal prison, writing in an email, "we will need to work together to get a suitable *Jackson* finding[7] in order to move forward with commitment in the Habilitation Court."

45.     On March 18, 2015, DDS formally determined that Markelle was eligible for its services based on his intellectual disability, and documented its decision in a letter dated March 20, 2015.

46.     In April 2015, DDS sent a letter to Markelle stating that as soon as his

---

Developmental Disabilities Administration ("DDA") and Rehabilitation Services Administration ("RSA").

[7]     A *Jackson* finding is a reference to a court's finding, pursuant to *Jackson v. Indiana,* 406 U.S. 715 (1972), that a defendant incompetent to stand trial, and unlikely to become competent, cannot be confined indefinitely.  In *Jackson,* the Supreme Court held that a defendant committed solely on the basis of incompetency "cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future." *Id.* at 738.  Prior to this ruling, virtually all states allowed the automatic and indefinite commitment of incompetent defendants.  The Court ruled that holding defendant Jackson (who had intellectual disability and was deaf) to a "more lenient commitment standard and to a more stringent standard of release than those generally applicable to all others not charged with offenses" deprived him of equal protection. *Id.* at 716.  The Court also concluded that, "[a]t the least, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." *Id.* at 738.  Thus, the ruling identified the necessity of either initiating civil commitment or releasing a defendant whose competence is not likely to be restored. *Id.*

competence status was resolved, DDS would initiate civil commitment proceedings in the District. In its April 17, 2015 letter, Musu Fofana, a Program Manager with DDS, acknowledged that:

      a.  Markelle is an individual with intellectual disability who is eligible to receive DDS services;

      b.  Markelle was determined to be incompetent to stand trial for the above-mentioned crimes; and

      c.  "…once [DDS has] a *Jackson* finding from the federal court, DDS/DDA *will work with your attorneys and the federal authorities in filing for civil commitment* in the Mental Health and Habilitation Branch of the D.C. Superior Court's Family Division." (emphasis added).

47.     On April 23, 2015, two DDS case managers met with Markelle at the District's Correctional Treatment Facility to work on the person-centered plan that is part of DDS's process of developing an Individual Support Plan ("ISP"). DDS policy requires that an ISP: "1. [s]upports the person to achieve individually defined outcomes and goals in the most integrated community setting appropriate to his or her needs; 2. [s]upports the person to exercise positive control over their life; 3. [e]nsures delivery of services in a manner reflecting personal preferences and choices and respecting what is important to and for the person; and 4. [s]upports the person's health and well-being."[8]

48.     On July 13, 2015, DDS's then-Director Nuss and other DDS staff, including then-Deputy Director Holly Morrison and the agency's General Counsel, Mark Back, met to discuss

---

[8]  *Policy: Person Centered Planning Process and Individual Support Plans* at 3, 2017-DDA-POL001, Dep't on Disability Servs. (2017), https://dds.dc.gov/sites/default/files/dc/sites/dds/publication/attachments/2017-DDA-POL001%20Person%20Centered%20Planning%20Process%20and%20Individual%20Support%20Plans%20Policy.pdf.

Markelle's case.  At that meeting, Director Nuss explained that DDS is accustomed to managing a wide range of behavioral challenges with its clients and it was prepared and equipped to address any issues presented by Markelle.

49.     Following that meeting, on August 6, 2015, DDS Deputy Director Morrison notified Markelle's counsel by email that DDS had identified a service provider, Benchmark Human Services ("Benchmark"), to serve Markelle and that DDS would be conducting a formal assessment to determine the parameters of a plan for Markelle.  DDS explained that Benchmark had a history of working successfully with complex and challenging DDS clients and had a proven track record of successfully serving in the community individuals with intellectual and other developmental disabilities whose behavior had brought them into contact with the criminal justice system, including individuals who presented dangerous sexual behaviors.

50.     On August 12, 2015, DDS Deputy Director Morrison emailed Benchmark's President for Residential Services and asked him to arrange an assessment of Markelle.

51.     From August 2015 through early 2017, DDS worked on developing a plan for Markelle's transition from the criminal justice system into the District's civil commitment system, which was expected to take place as soon as the issue of competency was resolved.

52.     DDS, through Benchmark, its contractor, retained an expert, Dr. Matthew Mason, a licensed Psychologist and Board-Certified Behavior Analyst and an expert in developmental disabilities, to evaluate Markelle and decide on the components of a service plan that "will both meet his needs and also account for concerns regarding the safety of others that are raised by the allegations [in the criminal case]."  Exhibit 2, Draft Description of Services for Mr. Markelle Seth at 1, Benchmark Human Services (Feb. 12, 2016) (hereinafter "Benchmark Service Plan").  Dr. Mason has particular expertise in working with individuals with intellectual disability who

present sexual behavior problems.

53.    After interviewing Markelle and reviewing his history, Dr. Mason concluded that Markelle would be "responsive to and appropriate for placement in a highly structured and supervised [minimum of one-to-one, round-the-clock supervision] community-based residential program," and determined specifically "that a more restrictive setting would not be necessary." It was DDS's expert's professional opinion, based on years of experience addressing similar concerns with respect to individuals with intellectual and developmental disabilities, that Markelle's behavioral issues, whether sexual or otherwise, could be readily and safely managed in a community setting.  Dr. Mason noted that "Benchmark has safely and successfully served individuals similar to and more behaviorally challenging than Mr. Seth in community settings with appropriate structure, staffing and programming." *Id.*

54.    Dr. Mason's plan outlined various safety mechanisms that he recommended to be employed in a community residence for Markelle, but concluded that the most important feature of a plan would be that it have a high degree of engagement for Markelle: "From Benchmark's experience working with individuals with profiles similar to Mr. Seth, it is clear that while the above safety precautions are necessary and appropriate, the most essential keys to a successful and safe experience for Mr. Seth will be engagement in activities that are meaningful to him, ensuring staff assigned to supervise him are well-trained and supported, providing high levels of supervision, as well as continuous oversight and evaluation of program services.  Building with Mr. Seth's active involvement a home and a way of life that he is invested in will be the surest way to achieve success and meet the needs of both Mr. Seth and his community." *Id.* at 4.

55.    Dr. Mason's proposal also recommended that Markelle be provided with other services available in the community, including, in particular, sexuality education tailored to the

17

needs of a person with his disability that is available through the DDA Health Initiative.  The leadership of that program met with Markelle and indicated their ability and willingness to provide him services.

56.    Following Dr. Mason's proposal, planning meetings to discuss services for Markelle and Dr. Mason's recommendations were held in early 2015 at DDS's offices and included DDS, Dr. Mason, and Markelle's counsel.  When Markelle's competency hearing in federal court was posted from January to May 2016, DDS determined that remaining planning for services should also be postponed, to be resumed once there was a suitable Jackson finding.  This determination was made on December 22, 2016, when Judge Howell adopted Judge Harvey's findings and held that Markelle could not restored to competence in the foreseeable future.  Order, *Seth*, No. 14-mj-608 (BAH/GMH) (Dec. 22, 2016) (Dkt 77).  At this point, Defendant DDS was expected to proceed with filing for civil commitment and finalizing a habilitation plan for Markelle.  However, in the interim period, Defendant Reese had replaced Laura Nuss as Director of DDS.  Instead of proceeding with a petition for civil commitment as planned, Defendant Reese requested that a new risk assessment of Markelle be prepared.

57.    Consequently, because no civil commitment proceedings were initiated in the District, Markelle was sent to FMC Butner where evaluations began to assess him for federal civil commitment.

58.    Defendant Reese retained Dr. Mason to prepare a new risk assessment of Markelle.  On February 24, 2017, Dr. Mason issued a comprehensive report, finding that Markelle "can be safely and successfully supported in the community" in a "highly structured, closely supervised community based program" that would "provide for community safety while ensuring that Markelle has every opportunity to succeed and to avoid re-offending."

18

59. Dr. Mason addressed Markelle's behavior while he has been held in custody in correctional facilities. Dr. Mason found that "while numerous and frequent, Markelle's problematic behaviors appeared relatively low in intensity and brief in duration." He noted that prison staff described Markelle's behavioral outbursts as "immature and impulsive" and that Markelle responded well and generally quickly to "de-escalation strategies during these outbursts" and demonstrated remorse after he calmed down. Dr. Mason noted that Markelle frequently reached out to others to assist with problem-solving and calming, which demonstrated "his interest in establishing supportive alliances."

60. Dr. Mason reported that correctional facility staff described Markelle as "collaborative and outgoing" but also required a high degree of monitoring given his difficulty understanding and adhering to rules. The correctional facility staff agreed that Markelle had difficulty following rules "not because he was a hardened criminal or oppositional in nature, but rather because he was immature, impulsive, and had a strong desire for immediate gratification." Staff described Markelle as "a likeable person with a sense of humor and playfulness."

61. Dr. Mason further reported that Markelle was not preoccupied with children or "deviant" sexuality. Prison staff noted that "although he was vulnerable to being taken advantage of by other inmates, he was not likely to try to take advantage of others, to attempt to develop relationships for the purposes of gaining sexual favor, or to otherwise act in a sexually predatory manner."

62. Dr. Mason analyzed the results from the administration of a number of risk assessment instruments, including instruments designed to assess the risk of sexual violence. Dr. Mason found that Markelle's cognitive, behavioral and emotional characteristics were not unusual, but instead are common in individuals with intellectual disability. Dr. Mason concluded

19

that Markelle's prior and current behavior, including his sexual misconduct, was not based on an "underlying psychopathic condition." Rather, such behaviors were "a function of inappropriate supervision" after having been placed in a position of caring for children, and "more opportunistic than predatory in nature, and influenced by his limitations in cognition and self-management." Dr. Mason found that Markelle's sexual abuse charges stemmed, in part, "from a lack of supervision by responsive adults and from having been affirmatively placed in a position of caring for children."

63.    Dr. Mason recognized that Markelle would "need significant mentoring and supervision to function effectively in the community, especially with regards to following accepted norms of social behavior and engaging in safe sexual practices." He found that Markelle did not appear to be "a flight risk . . . and his desire for social engagement, approval and need for supportive relationships are important compensatory strengths."

64.    Dr. Mason recommended the following criteria for a community-based placement for Markelle:

      a.    Markelle should be placed in a highly structured community-based residential program with "at least 1:1 staffing on a 24-hour basis" and with full and consistent daily schedule of employment and other meaningful activities. Staff assigned to Markelle should be thoroughly trained on his strengths and weaknesses, on the nature of his offenses, and on "non-negotiable safety practices." Markelle should "not live or work in areas with unsupervised access to children" and his behavior in the community must be monitored to prevent any unsupervised contact with minors.

      b.    Markelle should reside in a lower density neighborhood that promotes effective monitoring of exits.

      c.    DDS should develop comprehensive plans for Markelle that include behavioral management, crisis management, supportive psychiatric care, intensive counseling, psychosexual assessment and related sexual education,

and self-management plans for Markelle.

    d.   Staff working with Markelle should be trained on the importance of using positive programming strategies to help address Markelle's social deficits and challenges in problem-solving that stem from his intellectual disability.

65.    Dr. Mason stated that community supports for Markelle were appropriate and likely to be effective:

> Mr. Seth has demonstrated the capacity for establishing appropriate emotional ties, empathy and a desire to please others; these traits are indicators that he will be able to develop lasting, useful relationships with community-based staff and other supportive adults in his life. Based upon my extensive experience with many individuals with a variety of sexual behavioral problems, it is my opinion that Mr. Seth will respond well to supervision and supports. Mr. Seth's sociability, eagerness to please and willingness to create alliances with responsible adults are highly indicative that he will succeed if provided with appropriately designed supportive living and work environments that incorporate effective supervision.

66.    Dr. Mason's recommendations, prepared at the request of Defendant DDS, were endorsed by a subsequent evaluation prepared by a second expert, Dr. Stephen Hart, who was retained by Markelle's lawyers. Dr. Hart is a psychologist and research scientist who helped develop several of the risk assessment tools used by BOP and other experts who evaluated Markelle.

67.    In his June 18, 2017 risk assessment evaluation and report, which was provided to DDS, Dr. Hart agreed with Dr. Mason's conclusion that Markelle's sexual misconduct was not consistent with an underlying psychopathic condition. Rather, Dr. Hart concluded that Markelle's actions were more likely attributable to "restricted opportunity for sexual contact with age appropriate peers, along with deficiencies in judgment and impulse control" and which were "exacerbated by a lack of appropriate intervention and supervision."

68.     Dr. Hart also endorsed the risk management plans proposed by Dr. Mason, noting Dr. Mason's expertise in intellectual disability and praising the individually tailored and workable nature of Dr. Mason's recommendations. He found that, consistent with best practices:

> . . . the plans were based on a comprehensive assessment of risk factors; an individualized, integrative case formulation; identification of plausible scenarios; and attention to strategic, tactical, and logistical considerations. The plans also reflect a deep understanding of intellectual disability in general and the needs of Mr. Seth more specifically. Second, the management plans are remarkable or noteworthy for being feasible (i.e. available, accessible, and affordable), attentive to Mr. Seth's unique risk, need, and responsivity factors (i.e. appropriate), and consented to by Mr. Seth (acceptable).

69.     Dr. Hart also discussed Markelle's history of behavior problems while held in various correctional facilities, noting that they were minor, connected to Markelle's disability, and a result of an inappropriate environment and a lack of trained staff. According to Dr. Hart, Markelle's institutional history involved:

> Incidents that were primarily reactive in nature and minor in seriousness. Examples include minor rule violations (e.g. wearing the wrong clothes, not sharing a communal television with others) and problems dealing with interpersonal stress or conflict (e.g. rude or disruptive behavior when interacting with staff or fellow residents). Such incidents are expected when dealing with people with intellectual disability, especially when they are placed in closed living environments that lack the programs and trained staff to deal with their special needs (e.g., through contingency management, verbal de-escalation, and so forth).

**E. DDS Identified a Community-Based Provider Ready to Accept Markelle and Suitable for His and the Community's Needs.**

70.     While Markelle's competency proceedings were pending, Benchmark ceased operations in the District of Columbia. Wholistic Services, Inc. ("Wholistic")—a DDS-certified, D.C.-based provider of supportive services to individuals with intellectual and developmental

disabilities, including supported living, behavioral supports, and supported employment—was therefore asked to assess Markelle for placement in its program.  Wholistic conducted a comprehensive assessment of Markelle, and expressed its willingness and ability to provide an appropriate program to Markelle.  In February 2017, Miatta Thomas, Chief Administrative Officer of Wholistic, informed DDS that Wholistic could provide services to Markelle to successfully support him and eventually help transition him into the community.

71.     In August 2017, after DDS canceled planned group meetings to discuss Markelle's program, Wholistic provided DDS with a detailed Proposal for Transition, Safety and Support Services for Markelle ("Wholistic Proposal"), *see* Exhibit 3.  Wholistic characterized its Proposal as a "draft" but also indicated that it was ready to be put it into final form, subject to review by DDS.  In its Proposal, Wholistic stated that:

    a.  "Wholistic has safely and successfully served people similar to and more behaviorally challenging than Markelle in community settings with appropriate structure, staffing and programming."  Wholistic Proposal at 7.

    b.  Wholistic has "a proven track record of successfully serving people with intellectual and other developmental disabilities who have been involved in the criminal justice system, in particular people who have a history of dangerous sexual behaviors."  *Id.* at 6.

    c.  Wholistic had taken into consideration the seriousness of the charges brought against Markelle and the risk that insufficient supervision could present.  *Id.* at 5.

72.     Wholistic expressed confidence that it could account for this risk, noting that Markelle would be subject to "a high level of supervision 24/7" in order to protect both Markelle and members of the community.  *Id.* at 9.

73.     Wholistic's Proposal addresses each of the recommendations and criteria identified by DDS's expert, Dr. Mason, for a successful community-based placement for

Markelle.   Specifically, Wholistic proposed:

a.   Training its staff related to Markelle's specific safety and crisis management needs, including training in essential strategies for supporting individuals with intellectual disability, in order to address Markelle's needs, as well as strategies to manage the risks that someone with Markelle's history and disabilities could pose to the community.  *See id.* at 5-6, 8-9.

b.   Placing Markelle in highly structured residential setting with at least 1:1 staffing on a 24-hour basis.   Wholistic recognizes that increased staffing levels, such as a 2:1 supervision, may be necessary for up to the first year, and is ready to provide that level of supervision, if necessary.  Wholistic notes that a residential placement with no more than one other housemate would be best for Markelle, given his history of multiple placements (foster care, homelessness) and his difficulties in institutional settings interacting with others.  *See id.* at 7-8.

c.   Providing vocational services to Markelle, including a thorough evaluation of his skills and interests, and assistance with resume building, interview skills, and completing job applications.  Wholistic indicates that if Markelle gains employment, staff would continue 1:1 supervision of him, and would coach Markelle and his employer and co-workers to ensure the safety of Markelle and others.  *See id.*

d.   Training staff to use a mentoring model to supervise Markelle, including demonstrating desired behaviors, using non-directive coaching strategies, and other methods, all within a framework of non-negotiable safety rules and limits.   Wholistic states that Markelle would be fully informed of the supervision and safety requirements of his placement, and the consequences to him for violating those rules, including the potential for loss of community placement and liberty, and potentially incarceration.  *See id.* at 8.

e.   Developing a behavioral health and other professional services plan for Markelle.   Wholistic identified a specific university-based program in Washington, D.C., with extensive expertise in the assessment and training related to sexual behavior, a psychiatrist to perform a psychiatric consultation for Markelle, and a psychologist to address Markelle's individual therapeutic needs and issues, including his history of abuse, the development of appropriate relationships, improving his self-management skills, and building his self-esteem.   Wholistic also proposes retaining a registered nurse to

monitor Markelle's medical care needs on a weekly basis. *See id.* at 9.

74.     As of the date of this filing, Wholistic remains willing and able to provide the recommended services to Markelle.

**F. DDS Reneged on Its Commitment and Obligation to Provide Markelle with Community-Based Supports and Services Pursuant to D.C.'s Civil Commitment Statute.**

75.     On April 22, 2016, Ms. Nuss departed DDS and Defendant Reese took over leadership of the agency as its Director.

76.     Ignoring both the recommendations of its own expert, Dr. Mason, and the willingness of Wholistic to serve Markelle in the community with the appropriate level of supports and services, DDS has inexplicably refused to move forward with Markelle's civil commitment. Upon information and belief, DDS has decided not to provide community-based services and supports to Markelle via the civil commitment mechanism pursuant to its obligations under D.C. Code § 7-1301.01 *et seq.*

77.     As a result of DDS's inaction, on April 14, 2017, FMC Butner's warden filed a certificate of mental disease in Markelle's federal civil commitment case in the Eastern District of North Carolina, noting that "suitable arrangements for State custody are not available."

78.     DDS's reversal of position and its apparent current plan to leave Markelle in federal custody indefinitely are inconsistent with the findings by Dr. Mason—DDS's own expert—that Markelle can and should return to the District and can be placed in a community-based program without posing a danger to himself or others. DDS's reversal is also inconsistent with its prior successful efforts to secure Markelle's acceptance into community-based programming under the strict requirements Dr. Mason recommended. DDS has ignored its own

25

medical evaluation and risk assessment, and reneged on its responsibility even *after* its due diligence and planning unequivocally demonstrated the appropriateness and feasibility of serving Markelle in the community.

### G. Markelle Struggles Within a Correctional Setting and Is Frequently Subjected to Solitary Confinement Due to His Intellectual Disability.

79.     Markelle has been held at FMC Butner on two separate occasions.  He was transferred to FMC Butner for the first time in April 2015 and spent four months there while the BOP endeavored to render him competent for trial, following which he was returned to the District of Columbia in September 2015.  In January 2017, after this Court concluded that Markelle is neither competent to stand trial nor restorable to competency in the foreseeable future, Markelle was returned to FMC Butner, where he remains today.

80.     Because FMC Butner is a correctional institution, Markelle, and other individuals like him who are awaiting civil commitment proceedings or who have already been civilly committed, are held alongside incarcerated inmates who have been convicted and are serving their prison sentences in the facility, as well as inmates who are held in pretrial detention.

81.     Because FMC Butner is a correctional institution, its inmates are expected to follow numerous rigid rules that govern every aspect of their daily lives. When inmates fail to follow institution rules, they are subjected to disciplinary measures that can include loss of privileges and/or disciplinary or administrative segregation in separate segregation areas.

82.     Administrative and disciplinary segregation are essentially forms of solitary confinement. While in segregation, inmates are confined to their cells, except for short periods of time when they are allowed to leave their cells for recreation.  Their interactions with other inmates and staff are limited.

83.     As a result of his intellectual disability, Markelle has struggled to comply with FMC Butner's rules, which do not contemplate the needs of individuals with intellectual and developmental disabilities.  He has been disciplined for not following orders from correctional officers and staff, for talking back or being disrespectful to correctional officers and staff, and for singing loudly while listening to music using headphones.  Markelle has also been disciplined for carrying a pop-tart back to his cell from the dining hall, failing to tuck in his clothes, wearing the wrong uniform shirt, refusing to buckle his belt, wearing earbuds in the prison hallways, and other similar behavior.  Markelle has also gotten into several conflicts with other inmates at FMC Butner as a result of, for example, disputes over which television shows to watch when he has wanted to watch cartoons.

84.     When Markelle has violated FMC Butner's rules, he has experienced a range of disciplinary consequences, including losing his phone privileges for months at a time, confiscation of his MP3 player and radio, and suspension of his commissary privileges.

85.     Of utmost concern, Markelle has been placed in segregation on numerous occasions, even for apparently minor infractions, such as speaking disrespectfully to an officer. When confined in this manner, Markelle is locked alone in a cell for a minimum of twenty-two to twenty-three hours a day.  When the institution is short-staffed he is not afforded the opportunity to leave the cell where he is confined at all.  Markelle was in segregation for virtually the entirety of the four-month period of his restoration evaluation.  *See* Magistrate's Report at 13.

86.     For an individual with an intellectual disability, such as Markelle, solitary confinement is recognized as being a particularly toxic setting that not only fails to provide equal

27

access to programs, services and activities, but can cause additional harm.[9]

87.     FMC Butner does not have the resources or staff necessary to meet Markelle's needs as an individual with intellectual disability and does not provide specific habilitation programming geared toward people with intellectual disability.   As DDS's own expert, Dr. Mason, made clear, Markelle has had difficulty following institutional rules and interacting properly with staff and other inmates because of challenges related to his intellectual disability.

88.     Within this highly restrictive setting, Markelle is unable to maintain consistent communications with his legal team, as his legal calls are not permitted with regularity and are routinely monitored by BOP staff.   Legal calls at FMC Butner occur in Markelle's counselor's office.   Markelle's counselor listens to his legal calls and intercedes to reprimand Markelle for discussing issues with his attorneys that she feels are "non-legal" including discussions regarding his pending disciplinary hearings and his resulting confinement in the Solitary Housing Unit.

89.     Dr. Mason recommended positive, non-directive programming strategies for Markelle.   Specifically, he noted: "[T]he most essential keys to a successful and safe experience for Mr. Seth will be engagement in activities that are meaningful to him, ensuring staff assigned to supervise him are well-trained and supported, providing high levels of supervision, as well as continuous oversight and evaluation of program services.   Building with Mr. Seth's active involvement a home and a way of life that he is invested in will be the surest way to achieve success and meet the needs of both Mr. Seth and his community." Benchmark Service Plan at 4.

---

[9]     In a landmark decision, the court in *Madrid v. Gomez,* 889 F. Supp. 1146 (N.D. Cal. 1995) concluded that for vulnerable prisoners, including those with intellectual disability, pre-existing mental illness and brain damage, "placing them in the SHU [Solitary Housing Unit] is the mental equivalent of putting an asthmatic in a place with little air to breathe." *Id.* at 1265.

This type of skills acquisition and behavior support is not present at FMC Butner and is not possible to achieve in such a setting.

90.     In addition to the conditions of his confinement within the institution, Markelle's confinement at FMC Butner has placed him far away from his family and circle of support in the District of Columbia.  Because Markelle's family, and in particular his father, with whom he maintains a close relationship, is financially unable to travel from the District to North Carolina, they are unable to see and interact with Markelle and provide him with additional support that could help lead to his re-integration into the community.

91.     In sum, FMC Butner cannot provide the community-based and personalized services to which Markelle is legally entitled.

## H. DDS Is Able to Serve Similarly Situated Individuals with Intellectual Disability and Associated Behavioral Issues Yet Has Abdicated Its Responsibility to Markelle.

92.     As a result of the *Evans v. Bowser*, No. 1:76-cv-00293 (D.D.C.) class action lawsuit filed in 1976 to remedy the constitutionally deficient level of care, treatment, education, and training provided to residents of Forest Haven—the District's former institution for people with intellectual and developmental disabilities—the institution closed in 1991 and the D.C. government[10] was charged with developing a quality support services delivery system for D.C. residents with intellectual and developmental disabilities.  Since 1991, the District has provided residents with intellectual and developmental disabilities services in small, community-based programs.  DDS's mission statement notes that it seeks to "provide innovative high quality services that enable people with disabilities to lead meaningful and productive lives as vital

---

[10]   The agency responsible for this work at the time was known as the Mental Retardation and Developmental Disabilities Administration.  In 2006, this agency was replaced with DDS.

members of their families, schools, workplaces and communities in every neighborhood in the District of Columbia." *DDS Mission Statement,* Dep't on Disability Servs., https://dds.dc.gov/page/dds-mission-statement.   DDS states that it is committed to person-centered service planning and delivery and community integration.

93.     Upon information and belief, DDS provides community-based services to other individuals who have faced similar criminal charges and whose behavioral challenges and corresponding risks are at least equivalent to those posed by Markelle's intellectual disability and associated behavioral issues.   As noted above, DDS's own expert has found that DDS can treat and serve Markelle, and DDS committed to doing so following the *Jackson* determination.

94.     Upon information and belief, DDS has the capacity to plan and monitor individualized services for Markelle and has contracted with providers who are capable of executing DDS's plans.   It is impossible to guarantee outcomes, but the provider network in the District of Columbia, and DDS in particular, are well-prepared to address, and have a track record of serving, individuals who present risks similar to and greater than Markelle.

95.     Upon information and belief, through the Department of Behavioral Health, Defendant District of Columbia regularly provides community-based services to similarly situated D.C. residents with mental illness, but is refusing to serve Markelle.

96.     DDS's failure to accept responsibility flies in the face of D.C. Code § 7-1304.01, which, as its legislative history makes clear, was designed precisely for situations like Markelle's.   As such, there is no legitimate reason for DDS not to file a civil commitment petition in Markelle's case.

97.     As a result of Defendants' refusal to act, Markelle continues to remain in federal custody at FMC Butner.   Unless DDS acts, Markelle will remain incarcerated indefinitely

because of his disability, in a harmful setting in which he is subjected to solitary confinement, deprivation of privileges, and other disciplinary measures despite not having been convicted of any crime.

## V.   LEGAL FRAMEWORK

### A. By Failing to Provide Markelle with Services and Treatment in the Most Integrated Setting Appropriate, Defendants Have Violated Title II of the Americans with Disabilities Act of 1990 and Section 504 of the Rehabilitation Act of 1973.

98.     Congress enacted the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* ("ADA"), to provide a clear and comprehensive mandate for the elimination of discrimination against people with disabilities and to provide strong and consistent standards for identifying and addressing such discrimination. *Id.* § 12101(b)(1), (2).  The ADA is based on Congress's findings that: 1) "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem," *id.* § 12101(a)(2); 2) "individuals with disabilities continually encounter various forms of discrimination, including . . . relegation to lesser services, programs, activities, benefits, jobs, or other opportunities," *id.* § 12101(a)(5); and 3) "discrimination against individuals with disabilities persists in such critical areas as . . . institutionalization . . . and access to public services." *Id.* § 12101(a)(3).

99.     The ADA defines a "disability" as "a physical or mental impairment that substantially limits one or more major life activities." *Id.* § 12102(1)(A).  The ADA defines "major life activities" as including "learning, reading, concentrating, thinking, [and] communicating," as well as major bodily functions, such as brain function. *Id.* § 12102(2)(A), (B).  The regulations implementing Title II of the ADA make clear that intellectual disability

"will virtually always be found to impose a substantial limitation on a major life activity." 28 C.F.R. § 35.108(d)(2)(ii), (iii)(C). Markelle has a disability as defined in the ADA, and is entitled to the protections of the ADA.

100. Title II of the ADA provides that "[n]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Title II applies to all services, programs, and activities of public entities. *See id.* Defendants are public entities and must comply with Title II of the ADA.

101. Congress directed the Attorney General of the United States to promulgate regulations enforcing Title II of the ADA and to provide guidance on their content. *Id.* § 12134. The regulations specify that it is unlawful discrimination for a public entity to: 1) "[a]fford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others," 28 C.F.R. § 35.130(b)(1)(ii); 2) "[p]rovide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others," *id.* § 35.130(b)(1)(iii); 3) fail to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities," *id.* § 35.130(d) ("the integration mandate"), which the Attorney General has defined as "a setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible," *id.* pt. 35, App. B; or 4) "utilize criteria or methods of administration . . . [t]hat have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities." *Id.* § 35.130(b)(3)(ii).

102.    The Supreme Court has held that discrimination prohibited under Title II of the ADA includes the unnecessary isolation or segregation of persons with disabilities.  In *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999), the Court held that public entities must provide community-based services to persons with disabilities when (1) such services are appropriate; (2) the affected persons do not oppose community-based treatment; and (3) community-based services can be reasonably accommodated, taking into account the resources available to the public entity and the needs of others who are receiving disability services from the entity.  *Id.* at 607. The Supreme Court explained that its holding "reflects two evident judgments." *Id.* at 600. First, "institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable of or unworthy of participating in community life." *Id.*  Second, "confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment." *Id.* at 601.

103.    Congress specifically authorized individuals who believe their Title II ADA rights are being violated to bring an action in a United States District Court.  42 U.S.C. § 12133 (incorporating the remedies and enforcement procedures available under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, which includes a private right of action).

104.    Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a) ("Section 504") provides: "No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . . ." *Id.*

105.    An individual with a disability is any person who has a disability as defined in §

33

12102 of the ADA, as described above. *Id.* § 705. Defendants' programs, services, and activities receive Federal financial assistance. Accordingly, Defendants are subject to the nondiscrimination requirements of Section 504.

106.    Congress directed that Title II of the ADA be interpreted in a manner consistent with Section 504, 42 U.S.C. §§ 12134(b), 12201(a), and the courts have followed this directive. *See, e.g.*, *Yeskey v. Pa. Dep't of Corr.*, 118 F.3d 168, 170 (3d Cir. 1997), *aff'd sub nom. Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206 (1998).

**B.  By Failing to Provide Markelle with Services and Treatment in the Most Integrated Setting Appropriate, Defendants Have Violated the D.C. Human Rights Act of 1977.**

107.    The D.C. Human Rights Act of 1977, D.C. Code § 2-1401.01 *et seq.* ("DCHRA"), defines "disability" identically to the ADA. *Id.* § 2-1401.02(5A).

108.    Discriminating on the basis of disability is proscribed by the DCHRA. *Id.* § 2-1401.01. The DCHRA provides: "Every individual shall have an equal opportunity to participate fully in the economic, cultural and intellectual life of the District and to have an equal opportunity to participate in all aspects of life, including, but not limited to, in employment, in places of public accommodation, resort or amusement, in educational institutions, in public service, and in housing and commercial space accommodations." *Id.* § 2-1402.01.

109.    The DCHRA further notes, "it shall be an unlawful discriminatory practice for a District government agency or office to limit or refuse to provide any facility, service, program, or benefit to any individual on the basis of an individual's actual or perceived . . . disability." *Id.* § 2-1402.73.

110.    The statute provides for a private right of action and damages. *Id.* § 2-1403.16. "The D.C. courts have always looked to cases from the federal courts in interpreting the D.C.

Human Rights Act, and have followed, wherever applicable, precedents from the federal courts'

treatment of comparable civil rights statutes." *Paralyzed Veterans of Am. v. Ellerbe Becket*

*Architects & Engineers, P.C.*, 950 F. Supp. 393, 405 (D.D.C. 1996).

## C. By Failing to Petition for Markelle's Civil Commitment in Order to Provide Him with Services and Treatment in the Most Integrated Setting Appropriate, Defendants Have Violated D.C.'s Citizens with Intellectual Disabilities Civil Rights Restoration Act of 2015.

111.   In 2002, D.C.'s Citizens with Intellectual Disabilities Civil Rights Restoration Act

of 2015, D.C. Code § 7-1301.01 *et seq.* ("CIDA"), was amended to establish a civil commitment

procedure for individuals with intellectual disability who have been charged with a violent crime

or sex offense but found incompetent to stand trial. [11]   The D.C. Council Committee Report for

CIDA stated that the legislation "is modeled after the Ervin Act provisions that govern civil

commitment in the context of individuals who have been found incompetent to stand trial due to

mental illness," since the Ervin Act does not address those who are found incompetent due to

intellectual disability. *See* Kathy Patterson, Chairperson, Committee on the Judiciary, *Bill 14-*

*616, the "Civil Commitment of Citizens with Mental Retardation Amendment Act of 2002,"* at 4,

Council of the District of Columbia (June 3, 2002), http://lims.dccouncil.us/Download/329/B14-

0616-COMMITTEEREPORT.pdf ("D.C. Council Committee Report").

112.   The Ervin Act, originally passed in 1964, was updated in 2002 to ensure that

individuals with mental illness receive treatment in the least restrictive, most integrated setting

---

[11]   The Disability Services Reform Amendment Act of 2018, D.C. Act 22-277, which amends
CIDA, was enacted on March 12, 2018.  This bill eliminates civil commitment for most
individuals with intellectual disability moving forward, but keeps intact the current
procedures regarding individuals like Markelle who are found incompetent to stand trial in
criminal cases.

appropriate.  The Act was also amended to provide for regular review of an individual's commitment to ensure restrictions are lifted as soon as possible.  The District's Department of Behavioral Health is responsible for providing services to D.C. residents with mental illness who are subject to the Ervin Act.

113.  CIDA was amended after two separate incidents in which individuals with intellectual disability were charged with violent offenses, were deemed incompetent to stand trial without the possibility of restoration of competence, and were not eligible for civil commitment under the Ervin Act because they did not have mental illness.  Both individuals continue to receive services successfully in the community from DDS.

114.  The CIDA legislation is the result of many years of efforts by the D.C. Council, in conjunction with advocates from the D.C. disability and civil rights communities, to ensure that individuals in Markelle's situation receive needed supports and services in the least restrictive setting[12] while simultaneously employing safeguards to preserve public safety in a way that provides the greatest possible protection of their civil rights.[13]

------------------------------------------------

[12]  While CIDA defines "commitment" as "placement in a facility, pursuant to a court order . . . of an individual found incompetent in a criminal case at the request of the District," D.C. Code § 7-1301.03(4), the statute defines "facility" as encompassing community-based living arrangements.  *See id.* § 7-1301.03(13).  Further, the recently enacted amendment to CIDA, D.C. Act 22-277, which has been signed by Mayor Muriel Bowser and is projected to become law on or about May 12, 2018, removes the term "facility" altogether from the statute's definition of commitment: "'Commitment' means services and supports from the D.C. Department on Disability Services, pursuant to court order . . . for a person found incompetent in a criminal case at the request of the District."

[13]  In the 2002 D.C. Council Committee Report for the law, Chairperson of the Committee on the Judiciary Kathy Patterson noted that the new iteration of the bill "emphasize[s] a civil rather than criminal approach to the issue."  D.C. Council Committee Report at 9.  The

### i.    *Purpose of D.C.'s Citizens with Intellectual Disabilities Act*

115.    The law's Statement of Purpose requires that any treatment, supports, and services must be provided in the least restrictive setting in a manner that is individually tailored and geared toward maximal community integration:

> . . . the design and delivery of care and habilitation services for persons with intellectual disabilities shall be directed by the principles of normalization, and therefore: (1) Community-based services and residential facilities that are least restrictive to the personal liberty of the individual shall be established for persons with intellectual disability at each stage of life development; (2) The use of institutionalization shall be abated to the greatest extent possible; (3) Whenever care in an institution or residential facility is required, it shall be in the least restrictive setting; and (4) Individuals placed in institutions shall be transferred to community or home environments whenever possible, consistent with professional diagnoses and recommendations.

D.C. Code § 7-1301.02(b).

116.    CIDA defines "least restrictive alternative" as "that living and/or habilitation arrangement which least inhibits an individual's independence and right to liberty.  It shall include, but not be limited to, arrangements which move an individual from: (A) More to less structured living; (B) Larger to smaller facilities; (C) Larger to smaller living units; (D) Group to

---

Report recounts the testimony of various community members, which included sex educators and civil and disability rights advocacy groups.  The input from the collective testimony included the following points that were later incorporated into the statute: 1) intellectual disability is not causally related to violence; 2) though the individual's disability does not change over time, individuals with intellectual disability benefit from sex education and other behavioral supports that teach about appropriate sexual conduct; 3) the legislation should not be enacted without a study of similar legislation throughout the country and a close examination of best practices, such as in the states of Washington and Vermont; 4) the legislation must focus on plans that target behavior and provide appropriate treatment options; and 5) any treatment plans created by the legislation should be individualized and tailored to the needs of the specific person.

individual residences; (E) Segregated from the community to integrated with community living and programming; and/or (F) Dependent to independent living." *Id.* § 7-1301.03(16); *see also id.* § 7-1305.03.

117.   CIDA further provides that an individual subject to civil commitment under the statute "shall be provided with the least restrictive and most normal living conditions possible consistent with preventing the individual from causing injury to others . . . . Individuals shall be taught skills that help them learn how to effectively utilize their environment and how to make choices necessary for daily living and . . . refrain from committing crimes of violence or sex offenses." *Id.* § 7-1305.02.  The statute also provides for an annual court hearing to review the individual's commitment in the event it is no longer appropriate, *id.* § 7-1304.11(a-1), a private right of action, *id.* § 7-1305.13, and damages, *id.* § 7-1305.14.  Sovereign immunity does not bar an action under CIDA.  *Id.* § 7-1305.13(c).

### ii.   *CIDA's Application to Individuals with Intellectual Disability Charged with a Crime*

118.   In line with CIDA's requirements, all of DDS's services for individuals who are civilly committed are provided in the least restrictive setting.  Although Markelle would require intensive, 24-hour supports, civil commitment under D.C. law would allow him to receive these services in his home community in the most integrated setting appropriate for his needs.

119.   CIDA provides that in the instance of an individual found incompetent in a criminal case, "the District shall have no more than 30 days from the date on which the finding is made that the individual is incompetent and not likely to gain competence in the foreseeable future in which to file a petition . . . .  For extraordinary cause shown, the Court may extend the

period of time within which the petition must be filed."[14]   *Id.* § 7-1303.12a(a).   Markelle was found incompetent by this court in December 2016.

120.     Absent any extraordinary cause, DDS has refused to petition for Markelle's commitment for over a year and has indicated that it has no plans to do so in the foreseeable future.  Since the time that DDS committed to serving Markelle in April 2015, it appointed a new director and subsequently has inexplicably refused to take responsibility for Markelle.  Unless DDS acts, Markelle will remain incarcerated indefinitely in a setting in which he is subjected to solitary confinement, deprivation of privileges, and other disciplinary measures due to his disability in a prison setting that is inappropriate for the supports and treatment he requires.

**D. Federal Civil Commitment Is Inappropriate Here.**

121.     Although civil commitment of incompetent defendants is typically a state function, as outlined above, federal law, 18 U.S.C. § 4246, provides that a federally charged defendant who is found incompetent to stand trial may be civilly committed by the federal government if, and only if, (1) he is found dangerous as a result of a mental condition, and (2) his home state refuses to take responsibility for his care and custody.  Federal civil commitment results in confinement by the BOP in a federal prison hospital until the prison authorities

---

[14]   The statute governing federal civil commitment, 18 U.S.C. § 4246(d), *see* discussion *infra* Section VI, also contemplates that the process of getting the state to take responsibility for a defendant found incompetent may be an ongoing process, noting that the Attorney General will have custody over the individual until the state "will assume such responsibility" and requiring the Attorney General to "continue periodically to exert all reasonable efforts to cause such a State to assume such responsibility for the person's custody, care, and treatment."  18 U.S.C. § 4246(d).

determine that it is safe to release the individual.

122.    Federal law recognizes the strong preference for returning an individual to his/her own state for commitment.   18 U.S.C. § 4246(d) states:

> The Attorney General shall release the person to the appropriate official of the State in which the person is domiciled or was tried if such State will assume responsibility for his custody, care, and treatment. The Attorney General shall make all reasonable efforts to cause such a State to assume such responsibility. If, notwithstanding such efforts, neither such State will assume such responsibility, the Attorney General shall hospitalize the person for treatment in a suitable facility, until (1) such a State will assume such responsibility; or (2) the person's mental condition is such that his release, or his conditional release under a prescribed regimen of medical, psychiatric, or psychological care or treatment would not create a substantial risk of bodily injury to another person or serious damage to property of another; whichever is earlier. The Attorney General shall continue periodically to exert all reasonable efforts to cause such a State to assume such responsibility for the person's custody, care, and treatment.

123.    The BOP's evaluation concluded that Markelle "is currently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to the property of another." Because DDS has failed to petition for Markelle's commitment, the BOP concluded that "suitable arrangements for State custody are not available," even though, as described above, they clearly are if only DDS would act to provide them. As a result, a petition for federal civil commitment was filed in the Eastern District of North Carolina on April 28, 2017.

124.    The circumstances here weigh overwhelmingly in favor of Markelle's civil commitment in the District: (1) DDS has authority and responsibility to petition for Markelle's civil commitment to provide him with supports and services in the most integrated setting appropriate in his home state pursuant to CIDA; (2) DDS's *own expert* agrees that Markelle can

and should be served in the community; and (3) a community-based provider in the District of Columbia with the capacity to do so has offered to serve Markelle.

125.    By refusing to fulfill their obligation to petition for custody of Markelle and provide services to him in the most integrated setting appropriate to his needs, Defendants, the District of Columbia, DDS, and its Director, Andrew Reese, have caused Markelle to remain in federal prison at FMC Butner—often in solitary confinement—in violation of Title II of the ADA, 42 U.S.C. § 12131 *et seq.*, Section 504, 29 U.S.C. § 794(a), the DCHRA, D.C. Code § 2-1401.01 *et seq.*, and CIDA, D.C. Code § 7-1301.01 *et seq.* Every day that Defendants fail to fulfill their legal obligation to provide community-based services to Markelle in his home state is another day that he is forced to languish in federal prison indefinitely without having been convicted of a crime.

126.    CIDA was passed as part of an intentional and deliberative effort to place responsibility on DDS for the exact scenario faced by Markelle. The law plainly requires DDS to provide Markelle with services in the most integrated setting appropriate to his needs in a way that simultaneously ensures public safety and the protection of his civil rights. Defendants' failure to fulfill their obligation under this law guarantees Markelle's continued placement in federal prison in violation of the ADA, Section 504, DCHRA, and CIDA.

## VI.    CAUSES OF ACTION

### COUNT 1: VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

127.    The allegations of paragraphs 1 to 126 above are incorporated herein.

128.    Markelle is a "qualified individual with a disability" as defined in the ADA, 42 U.S.C. § 12131(2); *see id.* § 12102(1). Markelle's intellectual disability substantially limits multiple major life activities, such as caring for oneself, learning, reading, concentrating and

thinking, and DDS has determined him to be eligible for disability services. Moreover, with appropriately tailored support systems such as those described above, Markelle can be served in the community without posing a threat to the health or safety of others.

129.    Defendant DDS is a public entity subject to the ADA.  *Id.* § 12131(1).

130.    By refusing to follow through on its promise to civilly commit Markelle and take him into custody, DDS is depriving him the benefits of its programs, activities, and services in violation of Title II of the ADA, *id.* §12132.

131.    Specifically, Defendants are, on the basis of disability, excluding Markelle from participation in or denying him the benefits of the services, programs, or activities of the District, or subjecting him to discrimination, including by:

> (i)    Denying Markelle the opportunity to participate in or benefit from an aid, benefit, or service;

> (ii)    Affording Markelle an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;

> (iii)    Providing Markelle with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others;

> (iv)    Providing different or separate aids, benefits, or services to Markelle than are provided to others unless such action is necessary to provide Markelle with aids, benefits, or services that are as effective as those provided to others;

> (v)    Otherwise limiting Markelle in the enjoyment of any right, privilege,

advantage, or opportunity enjoyed by others receiving the aid, benefit, or
service.

*See* 28 C.F.R. § 35.130(a), (b)(1).

132.    Upon information and belief, the District of Columbia regularly provides
community-based supervisory services to D.C. residents who are found not competent to stand
trial due to mental illness through the Department of Behavioral Health, but is failing to do so for
those with intellectual disability, such as Markelle.  Despite having both the resources to serve
these citizens  and a statutory  mandate to do so, DDS has failed  to act for Markelle.

133.    In addition, Defendants are denying Markelle the opportunity to participate in
services, programs, or activities that are not separate or different from those offered to others, *id.*
§ 35.130(b)(2), and utilizing  criteria or methods  of administration—

(i)    That have the effect of subjecting Markelle to discrimination on the basis
of disability;  or

(ii)    That have the  purpose  or effect  of defeating  or substantially  impairing
accomplishment  of  the  objectives  of  the  public  entity's  program  with
respect to Markelle.

*See id.* § 35.130(b)(3)(i)-(ii).

134.    DDS is also imposing or applying "eligibility criteria that screen out or tend to
screen out an individual with a disability or any class of individuals with disabilities from fully
and equally enjoying [a] service, program, or activity," without showing that "such criteria [are]
necessary  for  the  provision  of  the  service,  program,  or  activity  being  offered."    *Id.*  §
35.130(b)(8).

43

135.    Finally, DDS is failing to "administer services, programs, and activities in the most integrated setting appropriate to [Markelle's] needs." *See id.* § 35.130(d); *id.* § 35.152(b)(2); *see also Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999).

136.    In *Olmstead,* the Court determined "that, under Title II of the ADA, States are required to provide community-based treatment for persons with mental disabilities when the State's treatment professionals determine that such placement is appropriate, the affected persons do not oppose such treatment, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities." *Id.* at 607.

137.    As in *Olmstead*, numerous professionals, including DDS's own professionals, who have treated and evaluated Markelle, have concluded that he can and should be served in the community, Markelle wants to return to and be treated in the District, and there are community-based options available to him that can both meet his needs and provide for the community's security.

138.    By refusing to serve Markelle, DDS leaves him in a federal prison facility—often in segregated housing—that is unable to provide the necessary treatment, safe facilities, and integrated services required by the ADA. *See supra* paras. 98-106.

139.     Defendants have failed to comply with the nondiscrimination requirements of the ADA and the integration mandate of the ADA, based on Markelle's disability.

140.    Community-based services for Markelle can be reasonably accommodated, taking into account the resources available to the District and the needs of others who are receiving disability services from the District.    Defendants' actions in violation of the ADA were intentional.

141.    As a result of Defendants' violations of the ADA, Markelle has suffered harm.

142.    Unless enjoined by the Court, Defendants will continue to violate the ADA rights of Markelle.

## COUNT 2: VIOLATION OF SECTION 504 OF THE REHABILITATION ACT

143.    The allegations of paragraphs 1 to 142 above are incorporated herein.

144.    Markelle is a "qualified individual with a disability" as defined in Section 504, 29 U.S.C. § 794, *et seq*., Markelle's intellectual disability substantially limits multiple major life activities, such as caring for oneself, learning, reading, concentrating and thinking, and DDS has determined him to be eligible for disability services.

145.    Discrimination on the basis of disability is prohibited by Section 504: "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . . ." *Id.* § 794(a).

146.    DDS is a recipient of Federal financial assistance.

147.    As set forth above, DDS has discriminated against Markelle because of his intellectual disability. In doing so, they have denied him the benefits of its federally funded programs.

148.    DDS's actions in refusing to serve Markelle are intentional and Markelle has suffered harm as a result.

## COUNT 3: VIOLATION OF THE D.C. HUMAN RIGHTS ACT

149.    The allegations of paragraphs 1 to 148 above are incorporated herein.

150.    Markelle is an individual with a disability under the DCHRA, which defines "disability" identically to the ADA.  D.C. Code § 2-1401.02(5A).

151.    It is a violation of the DCHRA to discriminate on the basis of disability.  *Id*. § 2-1401.01.  The DCHRA provides: "Every individual shall have an equal opportunity to participate fully in the economic, cultural and intellectual life of the District and to have an equal opportunity to participate in all aspects of life, including, but not limited to, in employment, in places of public accommodation, resort or amusement, in educational institutions, in public service, and in housing and commercial space accommodations."  *Id*. § 2-1402.01.  The statute further notes that "it shall be an unlawful discriminatory practice for a District government agency or office to limit or refuse to provide any facility, service, program, or benefit to any individual on the basis of an individual's actual or perceived . . . disability."  *Id*. § 2-1402.73.

152.    Defendants have discriminated against Markelle on the basis of his disability in violation of the DCHRA.

153.    Community-based services for Markelle can be reasonably accommodated, taking into account the resources available to the District and the needs of others who are receiving disability services from the District. As a result of Defendants' violations of the DCHRA, Markelle has suffered harm.

154.    Unless enjoined by the Court, Defendants will continue to violate the DCHRA rights of Markelle.

### COUNT 4: VIOLATION OF THE CITIZENS WITH INTELLECTUAL DISABILITIES ACT

155.    The allegations of paragraphs 1 to 154 above are incorporated herein.

156.    CIDA requires that the District petition for civil commitment for individuals with

intellectual disability found incompetent to stand trial and not likely to gain competence in the foreseeable future in a criminal case within thirty days of such a finding absent a showing of extraordinary cause. *Id.* § 7-1303.12a(a). Once the person is committed, the statute requires that individuals with intellectual disability be "provided with the least restrictive and most normal living conditions possible . . . . This standard shall apply to dress, grooming, movement, use of free time, and contact and communication with the community . . . . Individuals shall be taught skills that help them learn how to effectively utilize their environment and how to make choices necessary for daily living and . . . to refrain from committing crimes of violence or sex offenses." *Id.* § 7-1305.02.

157. This court issued a finding of incompetence to stand trial in December 2016. DDS has an obligation to petition for Markelle's civil commitment to provide him with supports and services in the most integrated setting appropriate in his home state. Instead, Markelle has been held in federal custody for over a year, frequently placed in solitary confinement and subjected to a number of other harsh conditions and deprivation of privileges at FMC Butner, an unnecessarily harsh, inappropriate, and restrictive treatment placement.

158. CIDA requires DDS to provide Markelle with treatment and supervision services in the community in the most integrated setting appropriate to his needs in a way that simultaneously ensures public safety and the protection of his civil rights. Defendants' failure to fulfill their obligation under this law guarantees Markelle's continued placement in federal prison in violation of the law.

## PRAYER FOR RELIEF

WHEREFORE, Markelle prays that judgment be entered in his favor and against Defendants as follows:

A. Declaring that the Defendants' actions described above constitute violations of the Americans with Disabilities Act of 1990, Section 504 of the Rehabilitation Act of 1973, the D.C. Human Rights Act of 1997, and the Citizens with Intellectual Disabilities Civil Rights Restoration Act of 2015;

B. Granting preliminary and permanent injunctive relief requiring Defendants to promptly accept physical and legal custody of Markelle within a reasonable period of time, not to exceed thirty (30) days;

C. Awarding compensatory and punitive damages to Markelle including his out-of-pocket losses, emotional damages, and other harms caused by the Defendants' discriminatory conduct;

D. Awarding attorneys' fees and costs incurred in the prosecution of this action;

E. Granting such other and further relief as the Court may deem just and proper.

Respectfully submitted this 1st day of May, 2018.

/s/ Donald P. Salzman

Donald P. Salzman, D.C. Bar No. 479775
Daniel W. J. Becker, D.C. Bar No. 1024373
Gary DiBianco, D.C. Bar No. 458669
Rebecca M. Murday, N.Y. Bar No. 5584743,
D.C. Bar Application Pending, Motion for Pro Hac
Vice to Be Filed
1440 New York Avenue, N.W.
Washington, D.C. 20005-2111
Tel: (202) 371-7983
Fax: (202) 393-5760
Donald.Salzman@probonolaw.com

/s/ Eve L. Hill
Eve L. Hill,  D.C. Bar No. 424896
BROWN GOLDSTEIN & LEVY, LLP
120 East Baltimore Street, Suite 1700
Baltimore, Maryland 21202
Tel: (410) 962-1030
Fax: (410) 385-0869
EHill@browngold.com

/s/ Robert D. Dinerstein
Robert D. Dinerstein,  D.C. Bar No. 373443
AMERICAN UNIVERSITY, WASHINGTON COLLEGE OF
LAW, DISABILITY RIGHTS LAW CLINIC
4300 Nebraska Avenue, Y-202
Washington, D.C. 20016
Tel: (202) 274-4141
Fax: (202) 274-0659
RDiners@wcl.american.edu

/s/ Shira Wakschlag
Shira Wakschlag,  D.C. Bar No. 1025737
THE ARC OF THE UNITED STATES
1825 K Street, N.W., Suite 1200
Washington, D.C. 20006
Tel: (202) 534-3708
Fax: (202) 534-3731
Wakschlag@thearc.org