# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MARKELLE SETH,

        Plaintiff,

        v.

DISTRICT OF COLUMBIA, *et al.*,

        Defendants.

Civil Action No. 18-1034 (BAH)

Chief Judge Beryl A. Howell

## MEMORANDUM OPINION

The plaintiff, Markelle Seth, challenges his continued civil confinement "in federal prison despite not having been convicted of any crime," by virtue of the defendants' decision not to assume responsibility for his custody, care, and treatment, Compl. ¶ 1, ECF No. 1, after he was found incompetent to face a federal criminal charge of production of child pornography, in violation of 18 U.S.C. § 2251(b), *id.* ¶¶ 32, 34, 37, and was subjected to federal civil commitment proceedings in the Eastern District of North Carolina, where he was being held, *id.* ¶¶ 40–41. Less than one month after the filing of the instant complaint, the federal civil commitment proceedings concluded with a judicial finding, by clear and convincing evidence, that "as a result of" Seth's current mental condition, "his release would create a substantial risk of bodily injury to another person or serious damage to the property of another," such that he was ordered civilly committed to the custody and care of the Attorney General, under 18 U.S.C. § 4246. Order, dated May 24, 2018 ("E.D.N.C. Commitment Order") at 1, *United States v. Seth*, No. 17-hc-2090 (E.D.N.C. filed May 25, 2018). The instant complaint seeks, *inter alia*, "injunctive relief requiring Defendants" District of Columbia, District of Columbia Department on Disability Services ("DDS"), and Andrew Reese, in his official capacity as Director of DDS (collectively,

"defendants"), to "promptly accept physical and legal custody of" Seth, Compl. at 48, based on four alleged violations of federal and local antidiscrimination laws, including Title II of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12131 *et seq.*; Section 504 of the Rehabilitation Act of 1973 ("RA"), 29 U.S.C. § 794; the District of Columbia Human Rights Act of 1997 ("DCHRA"), D.C. Code § 2-1401.01 *et seq.*; and the Citizens with Intellectual Disabilities Civil Rights Restoration Act of 2015 ("CIDA"), D.C. Code § 7-1301.01 *et seq.*

The defendants have moved to dismiss the complaint, pursuant to Federal Rule of Civil Procedure 12(b)(6), contending that Seth has failed to state a claim upon which relief can be granted under the ADA, RA, DCHRA, or CIDA. *See generally* Defs.' Mot. Dismiss Pl.'s Compl. ("Defs.' Mot.") at 1, ECF No. 19. Meanwhile, Seth has moved for an order directing the Bureau of Prisons ("BOP") to permit expert access to Federal Medical Center ("FMC") Butner to interview the plaintiff. *See generally* Pl.'s Mot. Requesting Order ("Pl.'s Mot."), ECF No. 24. While a discrimination action is a creative effort to bring attention to this troubling situation, the allegations fail to support claims under the antidiscrimination laws and ultimately cannot provide the relief Seth seeks. Thus, for the reasons explained below, the defendants' motion is granted, and Seth's motion is accordingly denied as moot.

## I.     BACKGROUND

The statutory framework regarding federal competency determinations and civil commitment is discussed first, followed by the factual and procedural history of this case.

### A.     Statutory Framework

Congress established, in the Insanity Defense Reform Act of 1984 ("IDRA"), Pub. L. No. 98-473, 98 Stat. 2057, a "three-stage statutory process pursuant to which competency determinations are made." *United States v. Weissberger*, 951 F.2d 392, 395 (D.C. Cir. 1991). First, upon motion by either party, "a court may order a competency evaluation committing a

defendant for a period not exceeding 30-days if the court has 'reasonable cause' to believe that the individual may be incompetent to stand trial." *Id.* (quoting 18 U.S.C. § 4241(a)). The results of that evaluation are presented at an adversarial hearing, "at which the judge determines whether a preponderance of the evidence indicates that the defendant is incompetent." *Id.* at 396 (citing 18 U.S.C. §§ 4241(a), (d)). Second, "upon a finding of incompetency, the court may commit the defendant for a 'reasonable time, not to exceed four months . . . to determine whether there is a substantial probability that in the foreseeable future he will attain the capacity to permit the trial to proceed." *Id.* (alteration in original) (quoting 18 U.S.C. § 4241(d)(1)). Finally, at the end of that second confinement, "another hearing is held to determine if the defendant is a long-term incompetent and sufficiently dangerous to require indefinite institutionalization." *Id.* (citing 18 U.S.C. §§ 4241(d), 4246). If the court determines that "the defendant's mental condition has not so improved as to permit the proceedings to go forward," the defendant is then "subject to the provisions of sections 4246 and 4248." 18 U.S.C. § 4241(d).

Sections 4246 and 4248, in turn, provide for the continuing commitment of a person "in the custody of the Bureau of Prisons whose sentence is about to expire, or who has been committed to the custody of the Attorney General pursuant to section 4241(d), or against whom all criminal charges have been dismissed solely for reasons related to the mental condition of the person." *Id.* § 4246(a); *see also id.* § 4248(a). Under § 4246, if "the director of a facility" in which such a person is hospitalized certifies that the person "is presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another, and that suitable arrangements for State custody and care of the person are not available," the court for the district in which the person is confined "shall order a hearing to determine whether the person is presently suffering from a mental

disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another." *Id.* § 4246(a).[1]

If, after that hearing, "the court finds by clear and convincing evidence that the person is presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another, the court shall commit the person to the custody of the Attorney General." *Id.* § 4246(d). At the same time, the IDRA expresses "a clear preference for state placement, if and when available, of those committed federally." *United States v. Volungus*, 595 F.3d 1, 10 (1st Cir. 2010). Specifically, the IDRA provides that the detainee "shall" be released "to the appropriate official of the State in which the person is domiciled or was tried if such State will assume responsibility for his custody, care, and treatment," 18 U.S.C. § 4246(d), and the Attorney General "shall make all reasonable efforts to cause such a State to assume such responsibility," *id. See also United States v. Wigren*, 641 F.3d 944, 947 (8th Cir. 2011) ("Congress presumably thought the States should bear responsibility for the care of mentally ill persons from their jurisdictions, and the IDRA thus imposes a duty on the Attorney General to pursue state placement." (internal citation omitted) (citing S. REP. NO. 225, 98th Cong., 1st Sess. 208 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3182 (1984))).

If the State declines to assume responsibility for the person, "the Attorney General shall hospitalize the person for treatment in a suitable facility" until either (1) the State assumes that responsibility, or (2) the person's medical condition improves such that "his release, or his conditional release under a prescribed regimen of medical, psychiatric, or psychological care or

---

[1]     Section 4248 provides a similar process upon a director's certification that the person is "sexually dangerous." 18 U.S.C. § 4248(a). For the purposes of these statutes, references to "States" include the District of Columbia. *See id.* § 4246(h).

treatment would not create a substantial risk of bodily injury to another person or serious damage to property of another," whichever happens first.  18 U.S.C. § 4246(d)(1)–(2).  If no State assumes that responsibility, the Attorney General must "continue periodically to exert all reasonable efforts to cause such a State to assume such responsibility for the person's custody, care, and treatment."  *Id.* § 4246(d).

The IDRA also provides for regular review of and challenges to a person's ongoing federal civil commitment.  When a person is federally committed pursuant to 18 U.S.C. § 4246, the director of the facility to which that person is committed must "prepare annual reports concerning the mental condition of the person and containing recommendations concerning the need for his continued commitment," which reports are submitted to the court that ordered the commitment.  *Id.* § 4247(e)(B).  If the director "determines that the person has recovered from his mental disease or defect to such an extent that his release would no longer create a substantial risk of bodily injury to another person or serious damage to property of another, he shall promptly file a certificate to that effect with the clerk of the court that ordered the commitment."  *Id.* § 4246(e).  The court must then "order the discharge of the person or, on the motion of the attorney for the Government or on its own motion," shall "hold a hearing . . . to determine whether he should be released."  *Id.*  Upon a finding, by a preponderance of the evidence, that the person could be released or "conditional[ly] released under a prescribed regimen of medical, psychiatric, or psychological care or treatment" without "creat[ing] a substantial risk of bodily injury to another person or serious damage to property of another," *id.* § 4246(e)(2), the court "shall" order the person's release, with the appropriate conditions, *id.* § 4246(e)(2)(A)–(B).  In addition, "at any time during such person's commitment," the committed person's counsel or legal guardian may "file with the court that ordered the commitment a motion for a hearing to

determine whether the person should be discharged from such facility," provided that "no such motion may be filed within one hundred and eighty days of a court determination that the person should continue to be committed." *Id.* § 4247(h).

### B. Seth's Background

Seth is a resident of the District of Columbia with an intellectual disability. Compl. ¶ 1. When he was three months old, Seth was "removed from his mother's care through neglect proceedings" and placed in the orphanage at St. Ann's Infant Home located in Hyattsville, Maryland. *Id.* ¶ 24. He "spent time in two separate foster care homes before he was placed with his father in 1997, at the age of three." *Id.* Seth experienced "childhood seizures from infancy until he was about six years old," *id.* ¶ 25, and "had significant delays in reaching developmental milestones, including not being able to sit up on his own until age four and not being able to crawl until age five," *id.* In elementary school, he was "identified as having a disability and placed in special education classes," eventually receiving an "Individualized Education Program ('IEP') that focused on supporting his learning activities across a broad array of areas." *Id.* ¶ 26. By the time Seth reached the twelfth grade, his "standardized testing scores reflected math skills at a fourth-grade level, reading skills at a second-grade level, and writing skills at a first-grade level." *Id.* ¶ 27.

Seth's developmental disabilities and behavioral problems were evident to the Magistrate Judge presiding over his initial appearance following his arrest on the criminal charge and subsequent status hearings. The Magistrate Judge noted that, at one hearing, Seth "continuously fidgeted in his chair and did not appear to be paying attention," and at another hearing, he "spent the majority of the time coloring." Report & Recommendation ("R&R") at 14, *United States v. Seth*, No. 14-mj-608 (D.D.C. filed Dec. 1, 2016), ECF No. 75.[2] During the competency hearing,

---

[2] In ruling on a Rule 12(b)(6) motion to dismiss, the court may take judicial notice of matters of public record, such as prior court proceedings. *See Marshall Cty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1228 (D.C.

the Magistrate Judge noted that, "[f]or the bulk of the hearing," Seth "was either distracted or engaging in otherwise inappropriate courtroom behavior," such as "plac[ing] his hands over his ears as if to block out testimony that he was hearing," and he "spent a portion of the second day of the hearing with his head on the table." *Id.* at 26.

On April 17, 2015, in connection with Seth's underlying criminal proceedings, which are discussed in greater detail below, the DDS found that Seth "meets all three criteria for intellectual disability." Compl. ¶ 30.[3] Seth now "receives federal Supplemental Security Income benefits based on his disability, and he has been evaluated and found eligible for services as an adult with intellectual disability by Defendant DDS." *Id.* ¶ 31. This Court later found that Seth's full-scale IQ score "hovers somewhere between fifty-three and sixty-five, landing at the bottom one percent of his age group regardless of where in that range it falls." R&R at 33 (adopted by the undersigned on December 22, 2016); *see also id.* at 6 (noting that "[Seth] has been diagnosed with various mental impairments at different points in his life, but Intellectual Disability, Mild ('IDM') is the diagnosis that most aptly captures his condition"). Throughout the proceedings detailed below, various psychologists and psychiatrists have diagnosed Seth with "Autism Spectrum Disorder," *id.* at 10, and with IDM, *id.* at 15.

## C.      Seth's Competency Proceedings in the District of Columbia

On October 16, 2014, Seth was arrested and charged in this Court with "one count of production of child pornography for allegedly using his cell phone to videotape two children in

---

Cir. 1993). Accordingly, the Court will take judicial notice of the related proceedings arising from Seth's criminal case, *see United States v. Seth*, No. 14-mj-608 (D.D.C. filed Oct. 15, 2014), and of the related proceedings in the Eastern District of North Carolina, *see United States v. Seth*, No. 17-hc-2090 (E.D.N.C. filed Apr. 28, 2017).

[3]        The American Association on Intellectual and Developmental Disabilities ("AAIDD") defines "intellectual disability" in three prongs: "(1) significantly impaired intellectual functioning; (2) adaptive behavior deficits in conceptual, social, and/or practical skills; and (3) onset of the disability before age eighteen." Compl. ¶ 29 (footnote omitted) (citing AAIDD, *Definition of Intellectual Disability*, available at http://aaidd.org/intellectual-disability/definition). This definition has been adopted by the District of Columbia. *Id.*

his household engaging in sexual behavior with him, in violation of 18 U.S.C. § 2251(a)." Compl. ⁋ 32.[4]  Seth's initial appearance before a Magistrate Judge on that charge took place the same day, at which hearing the Magistrate Judge, upon "the insistence of [Seth's] counsel," ordered a preliminary competency screening with the District of Columbia Department of Behavioral Health, Pretrial and Assessment Branch ("DBH").  Order, dated Oct. 17, 2014, at 1, *United States v. Seth*, No. 14-mj-608 (D.D.C. filed Oct. 17, 2014), ECF No. 3; *see also* Order, dated Oct. 23, 2014 ("Preliminary Commitment Order") at 1, *United States v. Seth*, No. 14-mj-608 (D.D.C. filed Oct. 23, 2014), ECF No. 5.

The DBH completed its assessment on October 21, 2014, and recommended commitment pursuant to 18 U.S.C. § 4241.  Preliminary Commitment Order at 1.  Two days later, on October 23, 2014, Seth's counsel requested "an examination of [Seth's] mental competency . . . pursuant to 18 U.S.C. § 4241(a)," which motion was granted.  *Id.*  Seth was accordingly "committed to the custody of the Attorney General of the United States for placement in a suitable facility for a period not to exceed thirty days," *id.* at 2, for a determination of whether he was "presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him," *id.*  Seth was transported to the BOP's Metropolitan Correctional Center ("MCC") in New York on November 10, 2014, for this examination.  *See* Compl. ⁋ 34; Status Report, dated Nov. 14, 2014, at 1, *United States v. Seth*, No. 14-mj-608 (D.D.C. filed Nov. 15, 2014), ECF No. 10.  On

---

[4]        This charge was predicated on reports by a boy and a girl, ages 5 and 3, respectively, who told police that Seth, who lived with them, had on multiple occasions had both children perform oral sex on him and that Seth recorded this activity.  Criminal Complaint, Ex. 1, Statement of Facts at 1–2, *United States v. Seth*, No. 14-mj-608 (D.D.C. filed Oct. 15, 2014), ECF No. 1-1.  Three video files depicting child pornography of the same two children performing oral sex were recovered on Seth's cell phone, along with three other files of child pornography.  *Id*. at 2–3.  Ironically, Seth was the person who reportedly "flagged down" officers conducting a canvas of an area in response to a call for an assault with a dangerous weapon.  *Id.* at 1.  While they were speaking with Seth, the officers were approached by an individual who informed the officers of claims that "two minor victims had reported that [Seth] had touched their private parts."  *Id.*

December 22, 2014, BOP psychologist Dr. Samantha DiMisa issued her report, concluding that Seth "lacked the competency to understand the nature and consequences of the proceedings against him and to assist properly in his defense." R&R at 3.

On March 25, 2015, the parties to the criminal case appeared before a Magistrate Judge for Seth's first competency hearing. Order, dated Mar. 27, 2015, at 1, *United States v. Seth*, No. 14-mj-608 (D.D.C. filed Mar. 27, 2015), ECF No. 17. At this hearing, the Magistrate Judge found, "by a preponderance of the evidence," that Seth was "presently suffering from a mental disease or defect rendering him mentally incompetent in that he is presently unable to understand the nature and consequences of the proceedings against him and is unable to assist properly in his defense." *Id.* The Magistrate Judge accordingly ordered that Seth be "committed to the custody of the Attorney General," pursuant to 18 U.S.C. § 4241(d)(1), "for placement in a suitable facility" for "in-patient evaluation by a certified psychiatrist or psychologist for a reasonable period of time, not to exceed four months," to "determine whether there is a substantial probability that in the foreseeable future he will attain the capacity to permit the proceedings to go forward." *Id.*

Seth was transferred to FMC Butner, in North Carolina, on April 27, 2015, for his in-patient evaluation. R&R at 4. At a status conference on June 10, 2015, FMC Butner psychologist Dr. Kristina Lloyd informed the Court of her finding that Seth was not yet competent to stand trial. *Id.* The Magistrate Judge thus "ordered [Seth] to remain at FMC Butner for additional psychiatric evaluation and, if possible, competency restoration." *Id.* On July 21, 2015, "Dr. Lloyd informed the Court that it was quite likely that [Seth] would be restored to competency," *id.* (internal quotation marks omitted), a conclusion that she reaffirmed one month later in a "psychological evaluation report," in which she also concluded that Seth was "ready to be returned to court for resolution of his legal situation," *id.* Seth's counsel was

"[d]issatisfied" with this conclusion and requested that Seth be transported "to the Correctional Treatment Facility of the D.C. Jail ('CTF') so that his competency could be evaluated by an expert retained by [Seth]." *Id.* Seth's expert, Dr. Robert Denney, subsequently "evaluated [Seth] and concluded that he is not competent to stand trial." *Id.* at 5.

The parties then requested a competency hearing "to determine whether [Seth] has been restored to competency pursuant to 18 U.S.C. § 4241(e)," *id.*, and the matter was referred to a Magistrate Judge for that hearing. *Id.* The hearing, originally scheduled for January 2016, took place over two days on May 16 and 17, 2016. After the hearing, the Magistrate Judge concurred with defense counsel's position, concluding, in a written Report and Recommendation issued on December 1, 2016, that Seth "lacks the capacity to understand, think through, and answer even the most basic questions about the legal process and the case against him." *Id.* at 37. Moreover, "due to the lack of treatment for his mental impairment and the ineffectiveness of the efforts to restore him to competency to date," the Magistrate Judge concluded that Seth "is incapable of being restored to competency for the foreseeable future." *Id.* at 40.

This Court adopted the Magistrate Judge's Report and Recommendation on December 22, 2016, and remanded Seth to the custody of the Attorney General of the United States, pursuant to 18 U.S.C. § 4246, "for purposes of psychiatric and/or psychological examination to determine and certify pursuant to 18 U.S.C. §§ 4246 and 4248" whether Seth "is presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another and that suitable arrangements for State custody and care of the person are not available" or whether Seth "is a sexually dangerous person." Order, dated Dec. 22, 2016 ("D.D.C. Commitment Order") at 1–2, *United States v. Seth*, No. 14-mj-608 (D.D.C. filed Dec. 22, 2016), ECF No. 77.

Seth was accordingly transferred back to FMC Butner for that evaluation, and he remains at Butner today. Compl. ¶¶ 40–41.

**D.      Proceedings in the Eastern District of North Carolina**

Seth underwent, and continues to undergo, further treatment at FMC Butner. On April 11, 2017, over a year before Seth's complaint was filed, Butner psychologist Dr. Lloyd concluded that Seth was "suffering from a mental disease or defect as the result of which his release to the community would create a substantial risk for bodily injury to another person or serious damage to the property of another." Joint Status Report, dated May 24, 2017 ("Jt. Status Report") at 2, *United States v. Seth*, No. 14-mj-608 (D.D.C. filed May 24, 2017), ECF No. 85. Consequently, three days later, the Complex Warden at FMC Butner executed a "certificate of dangerousness," pursuant to 18 U.S.C. § 4246, stating that the "FMC-Butner forensic staff believe that [Seth] is currently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to the property of another. In addition, suitable arrangements for State custody are not available." Certificate of Mental Disease or Defect and Dangerousness ("Certificate") at 1, *United States v. Seth*, No. 17-hc-2090 (E.D.N.C. filed Apr. 28, 2017), ECF No. 1-1. That certificate was sent to this Court on April 24, 2017, and was filed with the District Court for the Eastern District of North Carolina on April 28, 2017. Jt. Status Report at 2.

Seth's competency hearing in the Eastern District of North Carolina was scheduled for May 24, 2018. Before that scheduled date, Seth filed the instant complaint, on May 1, 2018. One week later, on May 7, 2018, in an apparent effort to delay the North Carolina competency proceedings, Seth requested that the federal court in North Carolina "stay all further proceedings" there pending the outcome of the instant litigation in the District of Columbia. Mot. Stay Proceedings at 1, *United States v. Seth*, No. 17-hc-2090 (E.D.N.C. filed May 7, 2018),

ECF No. 25.  That court denied this request, finding "no overlap between the issue to be adjudicated [in the North Carolina case] and the issue to be litigated in the District of Columbia lawsuit."  Order, dated May 17, 2018, at 3, *United States v. Seth*, No. 17-hc-2090 (E.D.N.C. filed May 17, 2018), ECF No. 30.

Accordingly, on May 24, 2018, a competency hearing was held in the Eastern District of North Carolina.  The next day, that Court entered an order finding, "by clear and convincing evidence," that Seth was "presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to the property of another."  E.D.N.C. Commitment Order at 1.  The Court also found that "state placement is not available" in the District of Columbia.  Competency Hr'g Tr. (dated May 24, 2018) at 46:19, *United States v. Seth*, No. 17-hc-2090 (E.D.N.C. filed June 7, 2018), ECF No. 34.  Seth was thus ordered "committed to the custody and care of the Attorney General pursuant to 18 U.S.C. § 4246," E.D.N.C. Commitment Order at 1, in which status he remains today.

### E.     Attempts to Place Seth in a Community-Based Program in the District of Columbia

While Seth's federal competency and civil commitment proceedings were ongoing, his counsel continually attempted to have him placed in various community-based programs within the District of Columbia.  On February 13, 2015, before the first competency hearing in this Court, Seth's attorneys "applied to DDS for support and services because incarceration is an inappropriate and harmful placement for [Seth]."  Compl. ¶ 42.  Soon thereafter, then-Director of DDS Laura Nuss allegedly "acknowledged [Seth's] eligibility for services and the agency's duty to provide them to him through the civil commitment process."  *Id.*  On March 12, 2015, Nuss "confirmed that a favorable eligibility determination was forthcoming and that DDS would proceed with civil commitment."  *Id.* ¶ 43.  She encouraged Seth and his attorneys to work with

DDS, the Developmental Disabilities Administration ("DDA"), and the Rehabilitation Services Administration ("RSA") "to develop a person-centered approach to supporting [Seth] in the context of the court proceedings and the formal commitment process." *Id.* The next day, on March 13, 2015, DDS General Counsel Mark Back "acknowledged that DDS planned to move for civil commitment of [Seth] in order to remove him from federal prison, writing in an email, 'we will need to work together to get a suitable *Jackson* finding in order to move forward with commitment in the Habilitation Court.'" *Id.* ¶ 44.[5]

On March 18, 2015, DDS "formally determined that [Seth] was eligible for its services based on his intellectual disability, and documented its decision in a letter dated March 20, 2015." *Id.* ¶ 45. One month later, on April 17, 2015, DDS Program Manager Musu Fofana acknowledged that Seth "is an individual with intellectual disability who is eligible to receive DDS services," that Seth "was determined to be incompetent to stand trial for the above-mentioned crimes," and that "once DDS has a *Jackson* finding from the federal court, DDS/DDA will work with [Seth's] attorneys and the federal authorities in filing for civil commitment in the Mental Health and Habilitation Branch of the D.C. Superior Court's Family Division." *Id.* ¶ 46 (internal quotation marks, alteration, and emphasis omitted). One week later, two DDS case managers met with Seth at the CTF "to work on the person-centered plan that is part of DDS's process of developing an Individual Support Plan ('ISP')." *Id.* ¶ 47.[6]

---

[5] A "*Jackson* finding" refers to a court's determination of "whether there is a substantial probability" that "a person charged by a State with a criminal offense who is committed solely on account of his incapacity to proceed to trial . . . will attain that capacity in the foreseeable future." *Jackson v. Indiana*, 406 U.S. 715, 738 (1972).

[6] An ISP (1) "[s]upports the person to achieve individually defined outcomes and goals in the most integrated community setting appropriate to his or her needs"; (2) "[s]upports the person to exercise positive control over their life"; (3) "[e]nsures delivery of services in a manner reflecting personal preferences and choices and respecting what is important to and for the person"; and (4) "[s]upports the person's health and well-being." Compl. ¶ 47 (internal quotation marks omitted).

Seth was transferred to FMC Butner on or around April 27, 2015, for his in-patient evaluation. On July 13, 2015, former DDS Director Nuss and other DDS staff met to discuss Seth's case. *Id.* ¶ 48. Soon thereafter, on August 6, 2015, DDS informed Seth's attorneys that "DDS had identified a service provider, Benchmark Human Services ('Benchmark'), to serve [Seth] and that DDS would be conducting a formal assessment to determine the parameters of a plan" for him. *Id.* ¶ 49. One week later, on August 12, 2015, "DDS Deputy Director [Holly] Morrison emailed Benchmark's President for Residential Services and asked him to arrange an assessment of [Seth]." *Id.* ¶ 50. Subsequently, "from August 2015 through early 2017, DDS worked on developing a plan for [Seth's] transition from the criminal justice system into the District's civil commitment system, which was expected to take place as soon as the issue of competency was resolved." *Id.* ¶ 51.

During this period, Benchmark stopped operating in the District of Columbia, *id.* ¶ 70, and Wholistic Services, Inc.—"a DDS-certified, D.C.-based provider of supportive services to individuals with intellectual and developmental disabilities, including supported living, behavioral supports, and supported employment—was therefore asked to assess [Seth] for placement in its program," *id.* Wholistic conducted a "comprehensive assessment" of Seth, and, in February 2017, Wholistic Chief Administrative Officer Miatta Thomas "informed DDS that Wholistic could provide services to [Seth] to successfully support him and eventually help transition him into the community." *Id.*

In January 2016, when Seth's final competency hearing in this Court was postponed until May 2016, "DDS determined that remaining planning for services should also be postponed." *Id.* ¶ 56. Once this Court adopted the Magistrate Judge's Report and Recommendation on December 22, 2016, "DDS was expected to proceed with filing for civil commitment and

finalizing a habilitation plan for [Seth]." *Id.* During the postponement, however, "Defendant

Reese had replaced Laura Nuss as Director of DDS." *Id.* According to the Complaint, "[i]nstead

of proceeding with a petition for civil commitment as planned, Defendant Reese requested that a

new risk assessment of [Seth] be prepared." *Id.* Dr. Matthew Mason, DDS's expert, completed

the new risk assessment and, on February 24, 2017, issued a "comprehensive report" finding that

Seth "can be safely and successfully supported in the community in a highly structured, closely

supervised community based program that would provide for community safety while ensuring

that [Seth] has every opportunity to succeed and to avoid re-offending." *Id.* ¶ 58 (internal

quotation marks omitted). Dr. Mason's conclusions and proposed risk management plan were

endorsed, on June 18, 2017, by an expert retained by Seth's lawyers, Dr. Stephen Hart, *id.* ¶¶ 66–

68, who "agreed with Dr. Mason's conclusion that [Seth's] sexual misconduct was not consistent

with an underlying psychopathic condition," *id.* ¶ 67.

In between the issuance of these two expert reports, however, FMC Butner psychologist

Dr. Lloyd—the same doctor who had initially concluded that Seth could be restored to

competency, R&R at 4, a conclusion disputed by Seth's counsel—also reached a conclusion

regarding Seth's dangerousness. Dr. Lloyd concluded, on April 11, 2017, that Seth was

"suffering from a mental disease or defect as the result of which his release to the community

would create a substantial risk for bodily injury to another person or serious damage as to the

property of another." Jt. Status Report at 2. Accordingly, on April 28, 2017, the FMC Butner

warden "filed a certificate of mental disease in [Seth's] federal civil commitment case in the

Eastern District of North Carolina, noting that 'suitable arrangements for State custody are not

available.'" Compl. ¶ 77 (quoting Certificate at 1).[7] As discussed above, that proceeding

---

[7]     While Seth accuses the defendants of "ignor[ing] the fact that this case was filed prior to [Seth's] federal civil commitment," Pl.'s Opp'n Defs.' Mot. Dismiss ("Pls.' Opp'n") at 7, ECF No. 21, it is actually Seth who

resulted in an order, on May 24, 2018, three weeks after the complaint was filed, that Seth's release would "create a substantial risk of bodily injury to another person or serious damage to the property of another," E.D.N.C. Commitment Order at 1, and in his civil commitment "to the custody and care of the Attorney General pursuant to 18 U.S.C. § 4246," *id.*

F.      **The Plaintiff's Treatment while in Custody**

The complaint describes the harsh conditions Seth has endured at FMC Butner. As the complaint explains, "[b]ecause FMC Butner is a correctional institution, its inmates are expected to follow numerous rigid rules that govern every aspect of their daily lives," and "[w]hen inmates fail to follow institution rules, they are subjected to disciplinary measures that can include loss of privileges and/or disciplinary or administrative segregation in separate segregation areas." Compl. ¶ 81. Seth contends that, "[a]s a result of his intellectual disability, [he] has struggled to comply with FMC Butner's rules, which do not contemplate the needs of individuals with intellectual and developmental disabilities." *Id.* ¶ 83. Thus, Seth "has been disciplined for not following orders from correctional officers and staff, for talking back or being disrespectful to correctional officers and staff, and for singing loudly while listening to music using headphones." *Id.* He has also been "disciplined for carrying a pop-tart back to his cell from the dining hall, failing to tuck in his clothes, wearing the wrong uniform shirt, refusing to buckle his belt, wearing earbuds in the prison hallways, and other similar behavior." *Id.* Seth has also "gotten into several conflicts with other inmates at FMC Butner as a result of, for example, disputes over which television shows to watch when he has wanted to watch cartoons." *Id.*

---

ignores the fact that the Certificate of Dangerousness that gave rise to his commitment was filed over a year before the underlying complaint in this matter was filed. The filing of the Certificate on April 28, 2017, was reported to this Court on May 24, 2017, nearly a year before the complaint in this case was filed. *See* Jt. Status Report at 2. Seth was thus well aware of the possibility of a dangerousness filing before he filed his complaint and, in fact, before his expert, Dr. Hart, was able to issue his own report.

Due to these rule violations, Seth "has experienced a range of disciplinary consequences, including losing his phone privileges for months at a time, confiscation of his MP3 player and radio, and suspension of his commissary privileges." *Id.* ¶ 84. In addition, Seth has "been placed in segregation on numerous occasions, even for apparently minor infractions, such as speaking disrespectfully to an officer." *Id.* ¶ 85. When held in segregation, Seth avers that he "is locked alone in a cell for a minimum of twenty-two to twenty-three hours a day," and if the institution is short-staffed, "he is not afforded the opportunity to leave the cell where he is confined at all." *Id.* Seth allegedly was "in segregation for virtually the entirety of the four-month period of his restoration evaluation," *id.*, and he notes that "solitary confinement is recognized as being a particularly toxic setting that not only fails to provide access to programs, services and activities, but can cause additional harm," *id.* ¶ 86. Seth's commitment at FMC Butner has also "placed him far away from his family and circle of support in the District of Columbia," thus depriving him of "additional support that could help lead to his re-integration into the community." *Id.* ¶ 90.

### G.    Procedural History

Seth filed the underlying civil complaint in this action on May 1, 2018, alleging that the defendants have violated the ADA, RA, and DCHRA by "excluding [Seth] from participation in or denying him the benefits of the services, programs, or activities of the District, or subjecting him to discrimination." *Id.* ¶ 131. Seth also alleges that the defendants have violated the CIDA because that Act allegedly "requires DDS to provide [Seth] with treatment and supervision services in the community in the most integrated setting appropriate to his needs," and thus the defendants' "failure to fulfill their obligation under this law guarantees [Seth's] continued placement in federal prison in violation of the law." *Id.* ¶ 158. The plaintiff seeks a judgment "[d]eclaring that the Defendants' actions . . . constitute violations" of the ADA, RA, DCHRA, and CIDA; "[g]ranting preliminary and permanent injunctive relief requiring Defendants to promptly accept

physical and legal custody of [Seth] within a reasonable period of time, not to exceed thirty (30) days"; "[a]warding compensatory and punitive damages to [Seth] including his out-of-pocket losses, emotional damages, and other harms caused by the Defendants' discriminatory conduct"; and costs and fees. *Id.* at 48.  On September 4, 2018, the plaintiff filed the pending Motion Requesting an Order to Bureau of Prisons Directing Expert Access to Federal Medical Center Butner to Interview Plaintiff. *See generally* Pl.'s Mot.  Both motions are now ripe for review.

## II.    LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Wood v. Moss*, 134 S. Ct. 2056, 2067 (2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  A claim is facially plausible when the plaintiff pleads factual content that is more than "'merely consistent with' a defendant's liability" and that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)); *see also Rudder v. Williams*, 666 F.3d 790, 794 (D.C. Cir. 2012).  Although "detailed factual allegations" are not required to withstand a Rule 12(b)(6) motion, a complaint must offer "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action" to provide "grounds" of "entitle[ment] to relief," *Twombly*, 550 U.S. at 555 (alteration in original; internal quotation marks omitted), and must "nudge[ ] the[ ] claims across the line from conceivable to plausible," *id*. at 570.  Thus, "a complaint [does not] suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

In considering a motion to dismiss for failure to plead a claim on which relief can be granted, the court must consider the complaint in its entirety, accepting all factual allegations in

the complaint as true, even if doubtful in fact. *Twombly*, 550 U.S. at 555; *Sissel v. U.S. Dep't of Health & Human Servs.*, 760 F.3d 1, 4 (D.C. Cir. 2014) (noting that in considering a Rule 12(b)(6) motion, the "court assumes the truth of all well-pleaded factual allegations in the complaint and construes reasonable inferences from those allegations in the plaintiff's favor, but is not required to accept the plaintiff's legal conclusions as correct" (internal citation omitted)). In addition, courts may "ordinarily examine" other sources "when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *see also English v. District of Columbia*, 717 F.3d 968, 971 (D.C. Cir. 2013).

## III.    DISCUSSION

The defendants contend that the Seth has failed to state a claim under the ADA and the RA, because he has "not adequately alleged he is a qualified individual who has been denied services, programs, or activities by the District on the basis of his disability," Defs.' Mot. at 1; the DCHRA, because "he does not allege he was discriminated against by the District on the basis of his disability," *id.*; or the CIDA, because "CIDA does not provide for a private right of action," *id.* These issues are taken in turn before addressing Seth's motion for an order directing access for an examination.

### A.    Americans with Disabilities Act and Rehabilitation Act Claims

Congress enacted the Rehabilitation Act in recognition that "individuals with disabilities continually encounter various forms of discrimination in such critical areas as . . . institutionalization [and] health services." 29 U.S.C. § 701(a)(5). To that end, section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal

financial assistance." *Id.* § 794(a). The ADA, enacted later, also seeks to protect individuals with disabilities. As relevant here, Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Both the RA and the ADA require public entities to "make reasonable modifications" to accommodate covered individuals, unless they "can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i).

At the motion to dismiss stage, a plaintiff bringing discrimination claims under § 504 of the RA or Title II of the ADA "does not need to prove a *prima facie* case of discrimination." *McNair v. District of Columbia*, 213 F. Supp. 3d 81, 86 (D.D.C. 2016) (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510–12 (2002)); *see also Twombly*, 550 U.S. at 569–70 (affirming that *Swierkiewicz* remains good law). Thus, at this stage of the litigation, a plaintiff alleging discrimination under the ADA need only show "(1) that the plaintiff is a qualified individual with a disability; (2) that the public entity denied him the benefits of or prohibited him from participating in the entity's services, programs or activities; and (3) that denial or prohibition was 'by reason of' his disability." *Jackson v. District of Columbia*, 826 F. Supp. 2d 109, 125–26 (D.D.C. 2011) (quoting 42 U.S.C. § 12132), *aff'd*, No. 11-7156, 2013 WL 500809 (D.C. Cir. Jan. 18, 2013). Under the RA, only the third requirement differs: the plaintiff must show that the discrimination or exclusion was caused "*solely* by reason of" his disability. 29 U.S.C. § 794(a) (emphasis added).[8]

---

[8]     The parties dispute whether the word "solely" in § 504 of the Rehabilitation Act should be read out of the statutory text, such that the RA and the ADA are coextensive. *Compare* Defs.' Mem. Supp. Mot. Dismiss ("Defs.' Mem.") at 9, ECF No. 19 ("Under the Rehabilitation Act, the standard is higher: a plaintiff must show he was discriminated against *solely* by reason of his disability." (internal quotation marks and alteration omitted; emphasis in original)), *with* Pl.'s Opp'n at 19 ("Defendants incorrectly allege that the Rehabilitation Act invokes a higher standard for discrimination due to the presence of the word 'solely' in the statute. In reality, the ADA and Rehabilitation Act impose similar requirements regarding the basis of the Defendants' actions or inactions." (internal

Generally, "[a] plaintiff may base h[is] discrimination claim on one of three theories of liability: disparate treatment, disparate impact, or failure to make a reasonable accommodation." *Davis v. Shah*, 821 F.3d 231, 260 (2d Cir. 2016); *see also Chenari v. George Washington Univ.*, 847 F.3d 740, 747 (D.C. Cir. 2017) (quoting *Davis*, 821 F.3d at 259–60); *Drasek v. Burwell*, 121 F. Supp. 3d 143, 153 (D.D.C. 2015) (noting that "intentional discrimination" is "also known as 'disparate treatment' discrimination"). In addition, the Supreme Court has recognized that "[u]njustified isolation . . . is properly regarded as discrimination based on disability." *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 597 (1999). Seth contends that his complaint is sufficient to state claims for intentional discrimination, disparate treatment, disparate impact, and failure to accommodate. *See* Pl.'s Opp'n Defs.' Mot. Dismiss ("Pl.'s Opp'n") at 12–21, ECF No. 21. These claims are each insufficient for the same reason: Seth has failed to sufficiently establish that the defendants engaged in any of these purported forms of discrimination "by reason of his disability." In addition, Seth argues that the complaint states a claim for unnecessary segregation, or unjustified isolation, under *Olmstead*. *Id.* at 21–25. This claim is likewise insufficient.

1. ***Intentional Discrimination, Disparate Treatment, Disparate Impact, and Failure to Make Reasonable Accommodations***

The defendants do not dispute that they are public entities that denied Seth the benefits of or prohibited Seth from participating in their services. *See* Defs.' Mem. Supp. Mot. Dismiss

---

quotation marks and citation omitted)). The D.C. Circuit has not expressly addressed this question, although it has indicated, without identifying this difference in language, that the two statutes should be read similarly. *See Crandall v. Paralyzed Veterans of Am.*, 146 F.3d 894, 896–97 (D.C. Cir. 1998) ("The courts of appeals have overwhelmingly agreed that for this causal link to be shown the employer must have acted with an awareness of the disability itself, and not merely an awareness of some deficiency in the employee's performance that might be a product of an unknown disability. They have so found under both the Rehabilitation Act itself and the analogous provision of the Americans with Disabilities Act."). In addition, the D.C. Circuit repeatedly has acknowledged that § 504 of the Rehabilitation Act and Title II of the ADA "are similar in substance," and, consequently, "cases interpreting either are applicable and interchangeable." *Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1260 n.2 (D.C. Cir. 2008) (internal quotation marks omitted). Resolving this issue is unnecessary in this case, however, given that Seth failed to establish discrimination on the basis of his disability, let alone based solely on his disability.

("Defs.' Mem.") at 8–11, ECF No. 19. Rather, the defendants contend that Seth is not a "qualified individual," *id.* at 8, and that he has not shown that he was denied these services "by reason of his disability," *id.* at 9 (alteration and internal quotation marks omitted). *See also* Pl.'s Opp'n at 6–7, 12–25. These issues are taken in turn.

### a)  *Qualified Individual with a Disability*

Under the ADA and the RA, a "qualified individual with a disability" is defined as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2); *see also* 28 C.F.R. § 35.104. To be eligible for the DDS's services, Seth must establish, among other requirements, that he is a "resident of the District of Columbia," which is defined as "a person who maintains his or her principal place of abode in the District of Columbia, including a person with an intellectual disability who would be a resident of the District of Columbia if the person had not been placed in an out-of-state facility by the District." D.C. Code § 7-1301.03(22). The defendants claim that Seth has not made this showing, given that he "currently resides at FMC Butner," Defs.' Mem. at 9, and that Seth does not fall under the statute's enumerated class of persons "who would be a resident of the District of Columbia if the person had not been placed in an out-of-state facility by the District" because he was placed at Butner "not by the District, but by the U.S. Attorney General." *Id.* (internal quotation marks omitted). These arguments fall short.

The law is well established that "[a] person's residency does not change by virtue of being incarcerated in another state." *Hester v. District of Columbia*, 433 F. Supp. 2d 71, 78 (D.D.C. 2006) (citing *Lawrence v. District of Columbia Bd. of Ethics*, 611 A.2d 529, 532 (D.C. 1992)), *rev'd on other grounds by* 505 F.3d 1283 (D.C. Cir. 2007); *see also, e.g., Johnson v. Passman & Kaplan*, No. 03-7175, 2004 WL 2857277, at *1 (D.C. Cir. Dec. 13, 2004) (per

curiam) ("[T]he domicile of a prisoner before he was imprisoned is presumed to remain his domicile while he is in prison." (alteration omitted) (quoting *Sullivan v. Freeman*, 944 F.2d 334, 337 (7th Cir. 1991))); *Jones v. Hadican*, 552 F.2d 249, 250–51 (8th Cir. 1977); *Polakoff v. Henderson*, 370 F. Supp. 690, 693 (N.D. Ga. 1973), *aff'd*, 488 F.2d 977 (5th Cir. 1974); *Stifel v. Hopkins*, 477 F.2d 1116, 1121 (6th Cir. 1973). Other provisions of the D.C. Code also specify that "[n]o person shall be deemed to have gained or lost a residence by reason of absence while . . . kept at any institution at public expense." D.C. Code § 1-1001.02(16)(E).

In short, Seth was a resident of the District of Columbia before his incarceration, Compl. ¶ 17, and he thus remains a D.C. resident today. The fact that Seth was placed at FMC Butner by the U.S. Attorney General, and not the District, does not alter this conclusion, as the defendants argue. *See* Defs.' Mem. at 8–9. While the D.C. Code does specify that those individuals placed at out-of-state facilities by the District remain citizens, this is merely one class of individuals who remain citizens—the statute does not list this class of individuals to the exclusion of all others. Thus, although Seth is presently confined at FMC Butner, he remains a "resident of the District of Columbia" for the purpose of his eligibility for DDS services.

### b) *By Reason of Disability*

The crux of the defendants' dismissal motion is that Seth has failed to establish that he was denied DDS services and benefits "by reason of his disability." Defs.' Mem. at 9 (internal quotation marks and alteration omitted). Specifically, the defendants contend that Seth has not stated a claim for intentional discrimination, disparate treatment, disparate impact, or failure to make reasonable accommodations. *Id.* at 7–8; *see also* Defs.' Reply Supp. Mot. Dismiss ("Defs.' Reply") at 3–5, ECF No. 22. Seth contends that he has alleged sufficient facts to survive a motion to dismiss on each of these theories of discrimination. The defendants are correct.

To succeed on any of these theories of discrimination, the plaintiff must plead sufficient facts to establish that the complained-of "discrimination was due to his disability." *Howell v. Gray*, 843 F. Supp. 2d 49, 59 (D.D.C. 2012) (internal quotation marks omitted). That is, the plaintiff "must establish that the disability actually played a role in the decision making process and had a determinative influence on the outcome." *Id.* (internal quotation marks omitted) (quoting *Jackson*, 826 F. Supp. 2d at 115). Such a showing requires more than merely "recit[ing] the word 'discrimination'" in the complaint. *Bean v. Perdue*, No. 17-0140, 2017 WL 4005603, at *5 (D.D.C. Sept. 11, 2017). The plaintiff must instead allege some facts of discrimination that tend to show that the complained-of discrimination was based on, or based solely on, his disability. *See id.* (dismissing the plaintiff's RA claim when the plaintiff "ha[d] not alleged any acts of discrimination nor stated any facts suggesting that the USDA's denial of his request for loan servicing was due 'solely'—or even partly—to his disability"). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do,'" *Azam v. D.C. Taxicab Comm'n*, 46 F. Supp. 3d 38, 46 (D.D.C. 2014) (quoting *Twombly*, 550 U.S. at 555), "[n]or will a complaint survive if it tenders 'naked assertion[s]' devoid of 'further factual enhancement,'" *id.* (alteration in original) (quoting *Twombly*, 550 U.S. at 557).

The plaintiff has not made such a showing here regarding the alleged discrimination, whether in the form of intentional discrimination, disparate treatment, disparate impact, or failure to provide reasonable accommodations. Regarding intentional discrimination and disparate treatment, Seth must show that the defendants' actions were taken "at least in part 'because of,' not merely 'in spite of,' [their] adverse effects upon an identifiable group." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). Here, Seth contends that DDS is "utilizing criteria or methods of administration" for its services that "have the effect of subjecting [Seth] to

discrimination on the basis of disability," Compl. ¶ 133, but he provides no further details on these criteria, how they affected him, or the defendants' motivations for imposing such criteria. Seth also cites, as evidence of intentional discrimination, "DDS' record of providing similar services to individuals with behaviors similar to [Seth's] but with different disabilities than [Seth's]," Pl.'s Opp'n at 15 (citing Compl. ¶¶ 42–46, 48), but the cited paragraphs contain no mention of the services provided to other individuals and not to Seth. Seth identifies still other allegations from the complaint that purport to show intentional discrimination and disparate treatment, but these allegations concern only the defendants' change of position regarding his case. For example, Seth cites, as evidence of discrimination, "DDS' refusal to civilly commit [him] after having previously agreed to do so," *id.* (citing Compl. ¶¶ 76–78), and "the severe harm that [Seth] has suffered, and continues to suffer during his incarceration," *id.* (citing Compl. ¶¶ 34–36, 76–91), but these claims offer no indication of intentional discrimination or disparate treatment based on his disability. Notably, on April 17, 2017, the Complex Warden at Butner issued a Certificate of Dangerousness, certifying that Seth's "release would create a substantial risk of bodily injury to another person or serious damage to the property of another," Certificate at 1, a development that might also have affected the defendants' change in position regarding their ability to provide community-based treatment for him.

Seth also contends that "the District of Columbia regularly provides community-based supervisory services to D.C. residents who are found not competent to stand trial due to mental illness through the Department of Behavioral Health, but is failing to do so for those with intellectual disability," such as Seth. Compl. ¶ 14; *see also id.* ¶¶ 93–95, 132.[9] The complaint

---

[9] To the extent that this allegation reflects an effort to distinguish Seth's intellectual disability from a mental illness as the crux of his discrimination claims, that assertion is simply not developed in the complaint, which contains no facts indicating that the defendants treat people with intellectual disabilities differently from people with mental illnesses when determining whether they will receive the services at issue.

does not set forth any facts showing that the defendants' decision not to provide services to Seth was based on disability discrimination, however, let alone based "solely" on his disability as required under the RA.[10]  Rather, the complaint acknowledges that, on March 18, 2015, "DDS formally determined that [Seth] was eligible for its services based on his intellectual disability," *id.* ¶ 45, and diligently worked, for nearly two years, to "develop[ ] a plan for [Seth's] transition from the criminal justice system into the District's civil commitment system," *id.* ¶ 51.  After a leadership change at DDS, and perhaps more notably, after FMC Butner's filing of the Certificate of Dangerousness, the agency reassessed its position and "decided not to provide community-based services and supports to [Seth] via the civil commitment mechanism." *Id.* ¶ 76.  Although the defendants' decision not to seek custody of Seth may have been inconsistent with DDS's prior assurances, planning, and evaluations, merely changing a position or revising a recommendation, without more, does not amount to actionable discrimination.  Seth offers no reason to think that this change was made by reason of his disability, rather than, for example, budgetary choices made by the new leadership or FMC Butner's Certificate of Dangerousness.

The plaintiff next contends that he has "allege[d] sufficient facts to advance a disparate impact theory of discrimination."  Pl.'s Opp'n at 17 (capitalization omitted).  A claim of disparate impact "requires the identification of a specific [ ] practice that, while facially neutral, nonetheless had a disproportionate adverse effect on a protected class of individuals." *Anderson v. Duncan*, 20 F. Supp. 3d 42, 54 (D.D.C. 2013).  The complaint alludes to "criteria" and "methods of administration," Compl. ¶ 133, but no factual allegations describing what these criteria or methods were or how they affected different classes of individuals are presented to

---

[10]        Indeed, the allegations under Count 2, "Violation of Section 504 of the Rehabilitation Act," assert only that "DDS has discriminated against [Seth] because of his intellectual disability," Compl. ¶ 147, not that DDS discriminated against him "*solely* on the basis of" his disability, as required by the RA.  29 U.S.C. § 794(a) (emphasis added).

support the discrimination claim.  Indeed, Seth himself does not identify the facts in the

complaint that support this theory.  *See* Pl.'s Opp'n at 17–19.  Rather, in responding to the

motion to dismiss, Seth focuses on distinguishing *Doe v. Pfrommer*, 148 F.3d 73 (2d Cir. 1998),

a case that the defendants invoke in passing to argue that "[n]either the ADA nor the

Rehabilitation Act establish[es] an obligation to meet a disabled person's particular needs vis-à-

vis the needs of other handicapped individuals," Defs.' Mem. at 8 (quoting *Pfrommer*, 148 F.3d

at 83).  The facts of that case are distinguishable, but the case still shows the challenges of

bringing a discrimination claim in the context of a public agency's provision of disability

services.  *Pfrommer* involved allegations that the defendant agency had discriminated against the

plaintiff on the basis of his disability by "fail[ing] to provide him with reasonable accommodations

for his mental illness," including an individualized rehabilitation program that included a "job

coach and self-employment goals," and by "terminating his benefits until he received continued

mental therapy."  *Pfrommer*, 148 F.3d at 81.  The plaintiff was thus challenging "the substance

of the services provided to him," not "illegal discrimination against the disabled," *id.* at 84, and

accordingly, the district court's grant of summary judgment to the agency on the RA claims was

affirmed, *id.*  The Second Circuit also concluded that the ADA and the RA "mandate only that

the services provided by [a covered entity] to non-handicapped individuals not be denied to a

disabled person because he is handicapped."  *Id.* at 83.  As discussed, Seth has not shown the

defendants' decision not to seek custody was made "because he is handicapped."

Finally, Seth's failure-to-accommodate claim is similarly insufficient to survive a motion

to dismiss.  To prevail on a failure-to-accommodate claim, a plaintiff must establish that (1) "he

was disabled for the purposes of the Rehabilitation Act" or the ADA; (2) the public entity "had

notice of his disability"; and (3) the public entity "denied his request for a reasonable accommodation

of his disability." *Chenari*, 847 F.3d at 747 (internal quotation marks and alterations omitted). Seth contends that his reasonable-accommodations claim survives a motion to dismiss because "the Complaint alleges specifically that [Seth] was entitled to services for which he was found eligible by DDS and that he was excluded from these services on the basis of his disability." Pl.'s Opp'n at 20 (internal citation omitted) (citing Compl. ¶¶ 6, 132). Other than these bare allegations, however, Seth's complaint includes no specific allegations supporting the claim that he was denied accommodations—that is, community-based services—by the defendants due to his intellectual disability. *See Hinson ex rel. N.H. v. Merritt Educ. Ctr.*, 521 F. Supp. 2d 22, 30 (D.D.C. 2007) (granting motion to dismiss where the complaint "contain[ed] no specific allegations" regarding the plaintiff's ADA and RA claims). Rather, the complaint indicates only that after "repeatedly and unequivocally inform[ing] [Seth] and his counsel" that they "planned to commence civil commitment proceedings in order to provide him with community-based services," Compl. ¶ 6, the defendants subsequently "reneged on [their] prior explicit commitments" and decided not to provide him with such services, *id.* ¶ 9. *See also id.* ¶¶ 75–78.

While the Court is to assume the truth of all well-pleaded facts in the complaint, "[w]ithout any supporting factual allegations, [Seth's] assertions reduce to mere legal conclusions that are not entitled to the assumption of truth." *Boykin v. Gray*, 895 F. Supp. 2d 199, 208 (D.D.C. 2012), *aff'd*, 650 F. App'x 42 (D.C. Cir. 2016). Seth has offered no evidence that the defendants' decision not to initiate commitment and custody proceedings was made based on his disability—indeed, he hardly acknowledges the issuance of an FMC Butner medical report on April 11, 2017, finding that Seth's release would pose a danger to the community, or the FMC Butner Warden's Certificate of Dangerousness filed on April 28, 2017, while DDS's

discussions and planning were ongoing. Jt. Status Report at 2.[11]  Accordingly, Seth has failed to

state a claim for intentional discrimination, disparate treatment, disparate impact, or failure to

make reasonable accommodations under the ADA and the RA.

### 2. *Unjustified Isolation*

The defendants also contend that Seth's ADA and RA claims "fail to the extent they are

based on an unjust isolation theory" of discrimination.  Defs.' Mem. at 11.  The Supreme Court

recognized, in *Olmstead*, that "[u]njustified isolation . . . is properly regarded as discrimination

based on disability."  *Olmstead*, 527 U.S. at 597.  To succeed on an unjustified-isolation claim

under *Olmstead*, a plaintiff must show that (1) "the State's treatment professionals have

determined that community placement is appropriate"; (2) "the transfer from institutional care to

a less restrictive setting is not opposed by the affected individual"; and (3) "the placement can be

reasonably accommodated, taking into account the resources available to the State and the needs

of others with mental disabilities." *Id.* at 587.  The Court noted, however, that it was not holding

"that the ADA imposes on the States a standard of care for whatever medical services they

render, or that the ADA requires States to provide a certain level of benefits to individuals with

disabilities," but only "that States must adhere to the ADA's nondiscrimination requirement with

regard to the services they in fact provide." *Id.* at 603 n.14 (internal quotation marks omitted).

Here, Seth does not oppose a "transfer from institutional care to a less restrictive setting,"

*id.* at 587, but he has failed to offer sufficient indications that the defendants believe "community

---

[11]     In opposition to the defendants' motion to dismiss, Seth relies on *Alston v. District of Columbia*, 561 F.
Supp. 2d 29 (D.D.C. 2008), in which this Court "denied a motion to dismiss an ADA complaint" when the
complaint contained "no mention" of "any causes [of discrimination] other than the extent and severity of [the
plaintiff's] disabilities." Pl.'s Opp'n at 20–21 (internal quotation marks omitted).  *Alston* was decided before the
Supreme Court's decision in *Iqbal*, however, which explained that surviving a motion to dismiss "demands more
than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678; *see also id.* at 683
(dismissing the plaintiff's discrimination claim when the complaint "d[id] not contain any factual allegation sufficient
to plausibly suggest petitioners' discriminatory state of mind").  *Alston*'s continuing guidance regarding the analysis of
a motion to dismiss is therefore questionable, and in any event, that case does not control the outcome here.

placement is appropriate" or that "the placement can be reasonably accommodated," *id.* In fact, to the contrary, another court has now found, "by clear and convincing evidence," that Seth's release from institutional care would "create a substantial risk of bodily injury to another person or serious damage to the property of another," E.D.N.C. Commitment Order at 1, and that "state placement is not available" in the District of Columbia, Competency Hr'g Tr. at 46:19. Although the defendants may, at one time, have believed that community-based services would be an appropriate alternative for Seth, their decision not to move forward with accepting responsibility for his custody, care, and treatment indicates that they no longer find community-based treatment appropriate.

Seth nevertheless contends that the complaint alleges sufficient facts to support an unjustified-isolation theory of discrimination because the defendants "are administering their services in a manner that denies community-based services to [him] and forces him to remain unnecessarily in federal custody." Pl.'s Opp'n at 23; *see also* Compl. ¶¶ 77–78. This argument rests on the assumption that "the defendants are obligated to provide services to [Seth] despite his being in federal custody and his federal civil commitment." Pl.'s Opp'n at 7 (capitalization omitted). No such obligation exists. *Accord Traynor v. Turnage*, 485 U.S. 535, 549 (1988) ("There is nothing in the Rehabilitation Act that requires that any benefit extended to one category of handicapped persons must be extended to all other categories of handicapped persons.").

Under 18 U.S.C. § 4246, a certificate of dangerousness may issue only upon a finding that "suitable arrangements for State custody and care of the person are not available," 18 U.S.C. § 4246(a). Once an individual has been committed to the custody of the Attorney General, § 4246(d) requires that "[t]he Attorney General shall release the person to the appropriate official of the State . . . *if* such State will assume responsibility for his custody, care, and treatment." *Id.*

§ 4246(d) (emphasis added). In committing Seth to the custody of the Attorney General, both the Complex Warden at FMC Butner and the district court in North Carolina found that "state placement is not available" in the District of Columbia. Competency Hr'g Tr. at 46:19; *see also* Certificate at 1. Release to the appropriate officials in the District therefore was not required. The statute contains no language requiring the government to present evidence on the availability, or lack thereof, of appropriate custody for Seth in the District, *see Wigren*, 641 F.3d at 946 ("The IDRA does not provide for judicial review of the certification, or establish standards by which a court could determine whether suitable arrangements for State custody are available" (internal quotation marks omitted)), or requiring the District to take custody of Seth, *see id.* at 947 ("[T]he [IDRA] does not endow the committed person with a judicially-enforceable right to state custody." (internal quotation marks omitted)). Indeed, Seth does not contend that any such language exists. Thus, given the conditional language in § 4246, the Attorney General is not required to release a civilly committed person to the District in the absence of the District's willingness to assume responsibility for that person's custody, care, and treatment. *See* 18 U.S.C. § 4246(d) ("The Attorney General shall release the person to the appropriate official of the State in which the person is domiciled or was tried *if such State will assume responsibility for his custody, care, and treatment*." (emphasis added)). In the absence of suitable arrangements in the District, the three-factor *Olmstead* test is not satisfied and Seth has failed to plead a sufficient claim of unjustified isolation.[12]

---

[12]     Even if Seth had succeeded on his discrimination claims, this Court would be hard-pressed to order his release given the Certificate of Dangerousness and finding of dangerousness in the Eastern District of North Carolina. Nevertheless, although Seth has failed to state a claim under the antidiscrimination laws, alternative avenues for relief remain open. Seth may, for example, seek review of the dangerousness finding in the Eastern District of North Carolina. When a person has been ordered civilly committed, "at any time during such person's commitment," his counsel or legal guardian may "file with the court that ordered the commitment a motion for a hearing to determine whether the person should be discharged from such facility," and may continue to file such motions every 180 days. 18 U.S.C. § 4247(h). Seth's attorneys thus may challenge the dangerousness finding and Seth's continued commitment at regular intervals during his confinement, but they must do so in the Eastern District of

## B. District of Columbia Human Rights Act

The DCHRA states that "it shall be an unlawful discriminatory practice for a District government agency or office to limit or refuse to provide any facility, service, program, or benefit to any individual on the basis of an individual's actual or perceived . . . disability." D.C. Code § 2-1402.73. "District of Columbia courts interpreting the DCHRA 'have generally looked [for guidance] to cases from the federal courts' arising under federal civil rights statutes." *Whitbeck v. Vital Signs, Inc.*, 116 F.3d 588, 591 (D.C. Cir. 1997) (alteration in original) (quoting *Benefits Commc'n Corp. v. Klieforth*, 642 A.2d 1299, 1301–02 (D.C. 1994)). Thus, "the D.C. law is applied in the same manner as the parallel federal antidiscrimination provisions." *Paralyzed Veterans of Am. v. Ellerbe Becket Architects & Eng'rs, P.C.*, 950 F. Supp. 393, 405 (D.D.C. 1996).

The defendants contend that Seth has failed to state a claim under the DCHRA because "the factual allegations pled do not support a plausible inference that the District's decision not to petition for his custody (namely, to provide him disability services) was made 'on the basis of

---

North Carolina—the "court that ordered the commitment." *Id.* In addition, Seth's continued commitment is subject to annual review by the director of FMC Butner, who must "prepare annual reports concerning the mental condition of [Seth] and containing recommendations concerning the need for his continued commitment," which reports are submitted to the court that ordered the commitment. *Id.* § 4247(e)(B). If the director finds that Seth has sufficiently recovered from his mental disease or defect, he must notify the court and the court must then order Seth's release or hold a hearing on the issue. *Id.* § 4246(e). Seth could also initiate a *habeas* proceeding challenging his continuing custodial status. *See id.* § 4247(g) ("Nothing contained in section 4243, 4246, or 4248 precludes a person who is committed under either of such sections from establishing by writ of habeas corpus the illegality of his detention.").

Seth also identifies the case *United States v. Ecker*, 489 F. Supp. 2d 130 (D. Mass. 2007), in which a defendant in the District of Massachusetts was found not competent to stand trial. *Id.* at 132. While the defendant was undergoing further evaluation, the government filed a petition for civil commitment in the District of Minnesota, where the defendant was then in custody. *Id.* After the court in Massachusetts dismissed the indictment, *id.* at 133, the defendant filed a motion "to order the United States Attorney General to transfer him from federal custody [in Minnesota] to a state facility within the Commonwealth of Massachusetts." *Id.* at 131. While acknowledging the "principle of state responsibility for the care of the mentally ill" that is "clearly outlined in the text of" the IDRA, *id.* at 135, the court nevertheless noted that "the government is correct that neither this Court nor the Attorney General *can require* the Commonwealth of Massachusetts to assume responsibility for the care, custody and treatment" of the defendant. *Id.* at 137 (internal quotation marks and alteration omitted; emphasis in original). Nevertheless, recognizing the requirement, in § 4246, that the Attorney General "continue periodically to exert *all reasonable efforts* to cause such a State to assume such responsibility," *id.* at 136 (emphasis in original) (quoting 18 U.S.C. § 4246(d)), the court "direct[ed] the government to provide a detailed report within six months to this Court identifying all reasonable efforts exerted to cause the Commonwealth of Massachusetts to assume custody" of the defendant, *id.* at 137. Such relief is not available in this antidiscrimination case against only local government parties.

[his] actual or perceived . . . disability.'"  Defs.' Reply at 8 (alterations in original) (quoting D.C.

Code § 2-1402.73).  For the same reasons discussed above regarding Seth's ADA and RA

claims, Seth also has failed to establish that the defendants' decision not to petition for custody

in his case was made on the basis of his disability.  Seth alleges in the complaint that the

defendants have "discriminated against [him] on the basis of his disability in violation of the

DCHRA" and that "[c]ommunity-based services for [him] can be reasonably accommodated,"

Compl. ¶¶ 152–53, but the complaint contains no factual allegations explaining why the

defendants' change of heart is tantamount to discrimination under the ADA, the RA, or the

DCHRA.  In the absence of "any supporting factual allegations," *Boykin*, 895 F. Supp. 2d at 208,

these claims likewise do not survive a motion to dismiss.

### C.      Citizens with Intellectual Disabilities Act

Finally, the defendants contend that Seth's complaint fails to state a claim under the

CIDA, D.C. Code § 7-1303, *et seq.*, because "the civil commitment provision of CIDA [ ] does

not create a private right of action" and because the CIDA does not create an "obligation . . . that

the District petition for [Seth's] civil commitment."  Defs.' Mem. at 15–16.  Seth, in turn, argues

that a private right of action exists because "[Seth] is one of the class for whose special benefit

CIDA was created," Pl.'s Opp'n at 32, and that the CIDA "does not allow discretion to refuse

commitment to individuals who have been found incompetent," *id.* at 34.  The defendants have

the better arguments.

The CIDA contains only one provision that expressly references a civil remedy for the

enforcement of rights under the Act: D.C. Code § 7-1305.13(a), which states that "[a]ny

interested party shall have the right to initiate an action in the Court to compel the rights afforded

persons with intellectual disabilities under this chapter." D.C. Code § 7-1305.13(a).[13]  Under

that Act, however, "Court" refers to only "the Superior Court of the District of Columba," *id.*

§ 7-1301.03(8), and the CIDA makes no mention of a private right of action available in federal

court.  Thus, Seth's claims can proceed only if the CIDA includes an implied private right of

action available in federal court.

District of Columbia courts "appl[y] the test of *Cort v. Ash*, 422 U.S. 66 (1975), to

determine whether a D.C. statute creates an implied right of action."  *Dial A Car, Inc. v. Transp.,*

*Inc.*, 132 F.3d 743, 744 (D.C. Cir. 1998) (citing *Kelly v. Parents United for the D.C. Pub. Sch.*,

641 A.2d 159, 164 (D.C. 1994)).  This test requires a court to consider three factors: (1) whether

the plaintiff is "one of the class for whose *especial* benefit the statute was enacted"; (2) whether

the legislature offered "any indication of legislative intent, explicit or implicit, either to create

such a remedy or to deny one"; and (3) whether it is "consistent with the underlying purposes of

the legislative scheme to imply such a remedy for the plaintiff."  *Cort*, 422 U.S. at 78 (emphasis

in original).[14]  Of these three factors, "the most important consideration is whether the legislature

intended to create a private right of action."  *Dial A Car*, 132 F.3d at 744 (citing *Suter v. Artist*

*M.*, 503 U.S. 347, 364 (1992)).  The "relatively heavy burden" of establishing this legislative intent

rests with the plaintiff.  *Samuels v. District of Columbia*, 770 F.2d 184, 194 (D.C. Cir. 1985).

Regarding the first factor—whether Seth is "one of the class for whose *especial* benefit

the statute was enacted," *Cort*, 422 U.S. at 78 (emphasis in original)—the legislative history

---

[13]      The CIDA was recently amended by the Disability Services Reform Amendment Act of 2017, D.C. Bill
No. 22-154, which went into effect on August 3, 2018.  Unless otherwise noted, references to the CIDA and to Title
7 of the D.C. Code refer to the original provisions that were in place at the time the complaint was filed, rather than
the amended provisions.

[14]      A fourth *Cort* factor, whether the cause of action is "one traditionally relegated to state law, in an area
basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal
law," *Cort*, 422 U.S. at 78, "is not applicable when a federal statute is not at issue." *Kelly*, 641 A.2d at 163 n.10
(internal quotation marks and alteration omitted).

indicates that he is not part of this class. The section at issue here, which gives the District the option of petitioning for an individual's commitment, *see* D.C. Code § 7-1303.04(b-1), was enacted as part of the Civil Commitment of Citizens with Mental Retardation Amendment Act of 2002, D.C. Bill 14-616. The Committee Report explains that the purpose of the Act was to "ensure public safety and protect the community from individuals who may be dangerous to others without treatment or supervision," D.C. Bill 14-616, Committee Report at 1 (June 3, 2002), but the report does not mention any enforcement mechanisms afforded to those individuals in the absence of a determination by the Superior Court for the District of Columbia that the individual has an intellectual disability. Although the plaintiff is correct that the "CIDA is infused throughout with concern, compassion, and protections for individuals with intellectual disabilities who are caught up in the criminal justice system," Pl.'s Opp'n at 31–32; *see also* D.C. Code § 7-1301.02(a)(1), the CIDA and the rights it affords to persons with intellectual disabilities are focused on individuals who have been determined to be intellectually disabled under the process described in the CIDA, which is initiated by the District's filing of a petition in the Superior Court for the District of Columbia, under D.C. Code § 7-1303.04(b-1), to have a person who has been found incompetent in a criminal case "committed to a facility." D.C. Code § 7-1303.04(b-1). Here, the District opted not to petition for Seth's commitment, and accordingly, he does not fall into the class of persons for whose benefit this statute was enacted.

Seth also has not carried his burden of establishing the second *Cort* factor—whether the D.C. Council offered "any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one." *Cort*, 422 U.S. at 78. As discussed above, the only mention of civil remedies available under the CIDA is in § 7-1305.13, which applies only to persons who have been determined to be intellectually disabled by the Superior Court of the District of

Columbia. The Committee Report contains no mention of an enforcement mechanism or remedy for those individuals who have not yet been determined intellectually disabled under the hearing and review procedures of the CIDA. *See* D.C. Code §§ 7-1304.01 to .13. Seth nevertheless relies on *Kelly v. Parents United for District of Columbia Public Schools*, 641 A.2d 159 (D.C. 1994), in which the D.C. Court of Appeals concluded that the District's Nurse Assignment Act "created an implied private right of action permitting a parents group to sue on behalf of parents with children in schools without assigned nurses." Pl.'s Opp'n at 32 (citing *Kelly*, 641 A.2d at 164). *Kelly* rested on language from *Cort* that "[i]n situations in which it is clear that [the statute] has granted a class of persons certain rights, it is not necessary to show an intention to *create* a private cause of action." *Kelly*, 641 A.2d at 164 (emphasis in original) (quoting *Cort*, 422 U.S. at 82). The grant of rights to the class at issue in *Kelly* may have been "clear" in the Nurse Assignment Act, but the CIDA contains no such clear grant of a private right of action in federal court to the class of individuals to which Seth belongs—that is, individuals found incompetent in criminal cases for whom the District opted not to file commitment petitions. Thus, the second *Cort* factor does not weigh in favor of finding an implied right of action in federal court for individuals in Seth's position.

Finally, the third factor—whether it is "consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff," *Cort*, 422 U.S. at 78—also weighs against finding an implied right of action in federal court for individuals like Seth. Implying this remedy would permit any person who has been found incompetent in a criminal case, who believes he or she should be receiving DDS services or should be in the custody of the DDS, at taxpayer expense, to initiate an action, in federal court, compelling the District to take responsibility for his or her habilitation, care, and treatment. Such an implication would, as the

defendants argue, "render[ ] the discretion conferred by the statute totally impotent," Defs.' Mem. at 16, and would flood the federal district court with actions that properly are cognizable in the Superior Court of the District of Columbia. The CIDA vests the District with discretion as to whether a commitment petition should be filed in each individual case. *See* D.C. Code § 7-1303.04(b-1) ("For an individual found incompetent in a criminal case, a written petition by the District *may be filed* with the Court to have the individual committed to a facility." (emphasis added)). Accordingly, the CIDA does not provide an implied private right of action in federal court for individuals who have not been determined intellectually disabled through the process set out in that Act.[15]

Even if the CIDA did provide an implied private right of action in federal court for individuals like Seth, however, Seth would face an uphill battle in showing the sufficiency of his CIDA claims. Seth argues that the "CIDA requires that the District petition for civil commitment for individuals with intellectual disability found incompetent to stand trial and not likely to gain competence in the foreseeable future in a criminal case within thirty days of such a finding absent a showing of extraordinary cause." Compl. ¶ 156 (citing D.C. Code § 7-1303.12a(a)). Seth is correct that *if* the District decides to file a petition for civil commitment for such an individual, it "shall have no more than 30 days from the date on which the finding is made that the individual is incompetent . . . in which to file" that petition. D.C. Code § 7-1303.12a(a); *see also id.* § 7-1303.12a(a) (2018) (same). Section 7-1303.04(b-1), however,

---

[15]    Seth may be able, however, to challenge the District's inaction in the Superior Court of the District of Columbia. Section 7-1305.13(a) provides that "[a]ny interested party shall have the right to initiate an action in the Court to compel the rights afforded persons with intellectual disabilities under this chapter," D.C. Code § 7-1305.13(a) (2018), with "Court" defined as "the Superior Court of the District of Columbia," *id.* § 7-1301.03(8) (2018). Although a rigorous timeframe applies to the initiation of commitment proceedings, *see, e.g., id.* § 7-1303.12a(a) (2018), these time periods may be extended "[f]or extraordinary cause shown," *id.* In other words, while Seth does not have a federal right of action to enforce his rights under the CIDA, such an action may be available in the Superior Court of the District of Columbia.

makes clear that the District is not required to file such a petition every time such a finding is made. Rather, "[f]or an individual found incompetent in a criminal case, a written petition by the District *may be filed* with the Court to have the individual committed to a facility." *Id.* § 7-1303.04(b-1) (emphasis added); *see also id.* § 7-1303.04(b-1) (2018) (same).

Seth ignores the discretionary nature of this provision, relying instead on various mandatory provisions in the CIDA. *See* Pl.'s Opp'n at 33–35. For example, Seth cites § 7-1304.01, which states that "[p]roceedings for the commitment of a person found incompetent in a criminal case *shall* be commenced by the filing of a written petition by the District." *Id.* at 34 (emphasis in original) (quoting D.C. Code § 7-1304.01 (2018)). That provision merely sets out how commitment proceedings may be initiated; it does not require that the District initiate commitment proceedings in every given case. Similarly, Seth cites the requirement in § 7-1304.07 that "[t]he District *shall* present clear and convincing evidence that shows that the person whose commitment is sought is likely to cause injury to others as a result of an intellectual disability if allowed to remain at liberty." *Id.* at 34–35 (emphasis in original) (quoting D.C. Code § 7-1304.07(b) (2018)). That requirement is only triggered, however, upon the District's filing of a petition "pursuant to § 7-1303.04(b-1)," D.C. Code § 7-1304.07(b), which is discretionary. Seth also relies on § 7-1303.12a to argue that his "commitment to federal prison . . . is, by definition, not permitted by CIDA," Pl.'s Opp'n at 35, because the hearing on a commitment petition must occur "no later than 90 days from the date on which the finding is made that the individual is incompetent and not likely to gain competence in the foreseeable future," D.C. Code § 7-1303.12a(d), otherwise the individual must be placed in a DDS facility rather than a jail or prison, *id.* Again, that hearing is required only when the District opts to file a commitment petition. If the District chooses not to file such a petition, that ninety-day limitation

does not apply.  Thus, even if the CIDA did include an implied private right of action in federal

court for claims like Seth's, Seth would not have stated a claim under that Act.  Accordingly, his

CIDA claim shall be dismissed.

### D.     Seth's Motion for an Order to Bureau of Prisons Directing Expert Access to FMC Butner to Interview the Plaintiff

Seth has also filed a motion requesting an order to the BOP directing expert access to

FMC Butner to interview him for purposes of this lawsuit.  *See generally* Pl.'s Mot.  On July 2,

2018, Seth requested that FMC Butner approve a visit by one of his experts so that the expert

could evaluate him; officials at FMC Butner granted that request without requiring a court order.

*Id.* ⁋ 5.  On August 1, 2018, following the same procedures used to schedule the first expert's

request, Seth's counsel requested permission for a visit by a second expert, Dr. Jeffrey C.

Holden, "to evaluate the impact of [Seth's] current placement in a correctional facility on his

emotional and mental health."  *Id.* ⁋ 6.  This time, FMC Butner "stated that the FMC Butner

warden would not approve [the expert's] interview with [the Seth] without a court order."  *Id.*

⁋ 7.  Seth thus filed the pending motion, seeking "an order directing the warden of FMC Butner

to allow Dr. Holden to access FMC Butner so that he may interview Mr. Seth."  *Id.* at 6.  The

defendants contend that Seth's motion is premature as "no scheduling order governing discovery

has been issued, and defendants have moved to dismiss the Complaint in its entirety," Defs.'

Opp'n Pl.'s Mot. ("Defs.' Opp'n") at 2, ECF No. 25, and that nonparty BOP should be given an

opportunity to be heard on Seth's motion, *id.* at 3.  The BOP has taken no position on the motion.

*See* Pl.'s Reply Supp. Mot. Access, Ex. A, Email from Michael Bredenberg (BOP) to Donald

Salzman, dated Aug. 30, 2018, at 1, ECF No. 26-1.

Given the resolution of the defendants' motion to dismiss, Seth has no further need for

discovery in connection with this litigation.  Accordingly, his motion is denied as moot.

## IV.    CONCLUSION

For the foregoing reasons, the defendants' Motion to Dismiss the Plaintiff's Complaint is granted.  Accordingly, the plaintiff's Motion Requesting an Order to Bureau of Prisons Directing Expert Access to Federal Medical Center Butner to Interview Plaintiff is denied as moot.  An appropriate Order accompanies this Memorandum Opinion.

Date: September 28, 2018

_____
BERYL A. HOWELL
Chief Judge