# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MARKELLE SETH,

                Plaintiff,

        v.

DISTRICT OF COLUMBIA, *et al.*,

                Defendants.

Civil Action No. 18-1034 (BAH)

Chief Judge Beryl A. Howell

## <u>MEMORANDUM OPINION</u>

The plaintiff, Markelle Seth, seeks to alter or amend the portion of this Court's judgment entered on September 28, 2018, *see Seth v. District of Columbia*, No. 18-cv-1034 (BAH), 2018 WL 4682023 (D.D.C. Sept. 28, 2018) ("2018 Decision"), that dismissed with prejudice his complaint seeking to require the defendants, the District of Columbia, District of Columbia Department on Disability Services ("DDS"), and Andrew Reese, in his official capacity as Director of DDS (collectively, "defendants") to "promptly accept physical and legal custody of" Seth, Compl. at 48, ECF No. 1, based on four alleged violations of federal and local antidiscrimination laws, including Title II of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12131 *et seq.*; Section 504 of the Rehabilitation Act of 1973 ("RA"), 29 U.S.C. § 794; the District of Columbia Human Rights Act of 1997 ("DCHRA"), D.C. Code § 2-1401.01 *et seq.*; and the Citizens with Intellectual Disabilities Civil Rights Restoration Act of 2015 ("CIDA"), D.C. Code § 7-1301.01 *et seq.* As support for reconsideration, Seth asserts that dismissal of his Complaint with prejudice was "clear error," Pl.'s Mot. to Alter or Amend Judgment & Mot. for Leave to File Am. Compl. ("Pl.'s Mot.") at 2, ECF No. 29, particularly since he now "possesses additional facts that further support his claims and that specifically

address this Court's concerns" with his original complaint, *id.* He therefore seeks leave to file an Amended Complaint, a copy of which is attached to his motion. *See* Pl.'s Mot., Attachment 1, Proposed Am. Compl. ("Proposed Am. Compl."), ECF No. 29-1. For the reasons explained below, Seth's Motion to Alter or Amend the Judgment is denied, and his Motion for Leave to File an Amended Complaint is therefore denied as moot.

## I.  BACKGROUND

The 2018 Decision laid out this matter's statutory framework and procedural history in some detail, *see* 2018 Decision at *1–8, and thus only the essentials are recounted here.

### A.  Competency Proceedings in the District of Columbia and the Eastern District of North Carolina

Seth, a "resident of the District of Columbia with an intellectual disability," *id.* at *3, was arrested on October 16, 2014 and "charged in this Court with 'one count of production of child pornography for allegedly using his cell phone to videotape two children in his household engaging in sexual behavior with him, in violation of 18 U.S.C. § 2251(a)," *id.* at *4 (quoting Compl. ¶ 32). On October 23, 2014, Seth's counsel requested an examination of Seth's mental competency pursuant to 18 U.S.C. § 4241(a), which motion was granted. *Id.* Over the next several years, the parties followed the three-stage statutory process that the Insanity Defense Reform Act of 1984 ("IDRA"), Pub. L. No. 98-473, 98 Stat. 2057, establishes to determine whether an individual "is a long-term incompetent and sufficiently dangerous to require indefinite institutionalization." *United States v. Weissberger*, 951 F.2d 392, 395–96 (D.C. Cir. 1991) (citing 18 U.S.C. § 4241(d)); *see also* 2018 Decision at *2–3 (describing this statutory framework).

Since December 22, 2016, following this Court's adoption, "without objection" from either Seth or the government, of a Magistrate Judge's Report and Recommendation that Seth "is

incapable of being restored to competency in the foreseeable future," Seth has been in the custody of the Attorney General at FMC Butner, in North Carolina. *See* 2018 Decision at *5 (quoting Order (Dec. 22, 2016) at 1–2, *United States v. Seth*, No. 14-mj-608 (D.D.C. Dec. 22, 2016), ECF No. 77). On April 11, 2017, FMC Butner psychologist Dr. Kristina Lloyd concluded that Seth was "suffering from a mental disease or defect as the result of which his release to the community would create a substantial risk for bodily injury to another person or serious damage to the property of another." *Id.* (internal quotation marks and citation omitted). Three days later, the Complex Warden at FMC Butner executed a "certificate of dangerousness" pursuant to 18 U.S.C. § 4246, citing Dr. Lloyd's conclusions, and stating that "suitable arrangements for State custody are not available." *Id.* (internal quotation marks and citation omitted). This certificate was filed, on April 28, 2017, in the District Court for the Eastern District of North Carolina, the district where FMC Butner is located. *Id.*

On May 24, 2018, a competency hearing was held in the Eastern District of North Carolina, after which the Court entered an order finding "by clear and convincing evidence" that Seth was "presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to the property of another," *id.* at *6 (quoting E.D.N.C. Commitment Order ("E.D.N.C. Commitment Order") at 1, *United States v. Seth*, No. 17-hc-2090 (E.D.N.C. May 25, 2018), ECF No. 32), and that state placement was not available in the District of Columbia, *id.* (internal quotation marks and citation omitted). Seth was therefore committed to the custody and care of the Attorney General, pursuant to 18 U.S.C. § 4246. *Id.* (internal quotation marks and citation omitted).

Although Seth is committed to the custody of the Attorney General, the IDRA provides that a person "shall" be released "to the appropriate official of the State in which the person is

domiciled or was tried if such State will assume responsibility for his custody, care, and treatment." 18 U.S.C. § 4246(d). The Attorney General "shall make all reasonable efforts to cause such a State to assume responsibility," *id.*, and must hospitalize the person for treatment in a suitable facility until the State assumes responsibility or the person may be released without creating a substantial risk of bodily injury to another person or serious damage to property of another, whichever occurs first. *Id.* § 4246(d)(1)–(2). The Attorney General must "continue periodically to exert all reasonable efforts to cause such a State to assume such responsibility for the person's custody, care, and treatment." *Id.* § 4246(d).

"[A]t any time during [the] person's commitment," his counsel or legal guardian may "file with the court that ordered the commitment a motion for a hearing to determine whether the person should be discharged" from the facility, so long as no motion is filed within 180 days of a court determination that the person should continue to be committed." *Id.* § 4247(h). For the period of almost one year since Seth has been committed at FMC Butner, no such motion has been filed.

**B.    Efforts for Seth's Placement in D.C. Community-Based Program**

While Seth's federal competency and civil commitment proceedings were ongoing, his counsel made efforts to have him placed in a community-based program within the District of Columbia. 2018 Decision at *6–7. Beginning in March 2015, DDS and its then-Director Laura Nuss indicated that Seth was eligible for DDS services and DDS made plans to move for civil commitment of Seth. *See id.* at *6.

Prior to Seth's competency hearing in this Court in May 2016, *id.* at *5, defendant Reese replaced Nuss as the Director of DDS, and requested that a new risk assessment of Seth be prepared, *id.* at *7. DDS's expert, Dr. Matthew Mason, subsequently found, on February 24, 2017, that Seth could be safely supported in a highly structured, closely supervised

community-based program, *id.*, which conclusion was endorsed, on June 18, 2017, by Dr.

Stephen Hart, an expert retained by Seth, *id.* Between these two reports, however, FMC

Butner's expert Dr. Lloyd concluded that Seth's release to the community would create a

substantial risk for bodily injury to another person or serious damage to the property of another,

prompting the Complex Warden of FMC Butner to file a certificate of dangerousness, resulting

in a judicial order finding, by clear and convincing evidence, that Seth's release would create a

substantial risk of bodily injury to another person or serious damage to the property of another.

*Id.* Since that judicial order, which relies in part on a finding that suitable state arrangements are

not available, DDS has not attempted to take responsibility for Seth's care. This local agency

inaction has led to this lawsuit.

### C. Procedural History

Seth filed his original civil complaint in this action on May 1, 2018, after the Complex

Warden of FMC Butner issued a certificate of dangerousness but before the Eastern District of

North Carolina held a competency hearing. The defendants moved to dismiss under Federal

Rule of Civil Procedure 12(b)(6) on June 14, 2018, *see* Defs.' Mot. to Dismiss, ECF No. 19,

which motion was fully briefed as of July 26, 2018. Seth did not move for leave to amend his

complaint at any point prior to issuance of the September 28, 2018 Decision granting the

defendants' motion to dismiss.

The complaint was dismissed with prejudice as to all counts. *See* Order (Sept. 28, 2018)

at 1, ECF No. 27. The federal and state antidiscrimination claims were dismissed because Seth

failed to establish that he was discriminated against based on his disability, let alone based solely

on his disability. 2018 Decision at *12–13 (ADA and RA claims); *id.* at *15 (DCHRA claim).

Although Seth made much of DDS's apparent change of position regarding accepting

responsibility for his care, he offered nothing to suggest that DDS, an organization whose

purpose is to provide services for individuals with disabilities, changed its position as a result of Seth's disability rather than as a result of other factors, *inter alia*, a change in leadership at DDS, possible budgetary strains, and, most significantly, certification by the warden at FMC Butner and a holding by the Eastern District of North Carolina, based on clear and convincing evidence, that Seth posed a substantial risk of causing bodily injury to another person or serious damage to the property of another if released into the community. *See id.* at *12. Likewise, Seth's unjustified isolation claim failed because he could not offer sufficient indications that community placement was appropriate or could be reasonably accommodated, in light of the dangerousness finding in the Eastern District of North Carolina—a finding that may only issue if suitable arrangements for state custody or care are unavailable. *See id.* at *13–14. "In the absence of suitable arrangements in the District, the [unjustified isolation] test is not satisfied." *Id.* at *14. Notably, the Court pointed out that Seth has not challenged the dangerousness finding in the Eastern District of North Carolina by filing a motion for discharge under 18 U.S.C. § 4247(h) and has not challenged his continuing custodial status by initiating a *habeas* proceeding under 18 U.S.C. § 4247(g). *See id.* at *14 n.12 ("[A]lthough Seth has failed to state a claim under the antidiscrimination laws, alternative avenues for relief remain open."). Moreover, the Court noted that although Seth's unjustified isolation claim relied in part on *United States v. Ecker*, 489 F. Supp. 2d 130 (D. Mass. 2007), in which the court "direct[ed] the government to provide a detailed report within six months . . . identifying all reasonable efforts exerted to cause the [state] to assume custody," of a defendant committed to the care of the Attorney General, *id.* at 137 "[s]uch relief is not available in [Seth's] antidiscrimination case" as Seth sued only local government parties. 2018 Decision at *14 n.12.

Seth's CIDA claim was dismissed with prejudice because the CIDA does not create a private right of action in federal court for individuals, such as Seth, who have not been determined intellectually disabled through the process set out by the CIDA, which process entails a *discretionary* decision on the part of the District to file a commitment petition in the Superior Court of the District of Columbia. *See id.* at *15–17. Once again, the Court pointed out that Seth had not pursued his CIDA claim by challenging the District's inaction in the Superior Court of the District of Columbia. *See id.* at *17 n.15 ("[W]hile Seth does not have a federal right of action to enforce his rights under the CIDA, such an action may be available in the Superior Court of the District of Columbia." (citing D.C. CODE § 7-1305.13(a)).

### D. Plaintiff's Motion to Amend or Alter the Judgment and for Leave to Amend the Complaint

Rather than pursuing any alternative avenue of relief available to him in the Eastern District of North Carolina or in the Superior Court of the District of Columbia, Seth has returned once again to this Court, with the same claims, hoping for a different result.[1] Specifically, Seth moves to vacate the portion of the September 28, 2018 judgment dismissing his claims with prejudice, contending that dismissal with prejudice was clear error and that such dismissal is only permitted when there is no set of facts that he could possibly adduce to meet the pleading standards, whereas Seth now "possesses significant evidence . . . that reinforce[s] his claims." Pl.'s Mem. at 7–8. The defendants counter that "dismissal with prejudice was appropriate and leave to amend should be denied because there are no factual allegations consistent with those

---

[1] The plaintiff, failing to acknowledge or, apparently, to pursue these alternative avenues for relief, accuses the Court of leaving Seth "in a hopeless 'catch 22' situation in which he has no meaningful avenue for relief," Pl.'s Mem. in Supp. of Mot. to Alter or Amend Judgment & Mot. for Leave to File Am. Compl. ("Pl's Mem.") at 4, ECF No. 29, and "in cruel and hopeless limbo," *id.* at 16. In light of the plaintiff's allegations that "he is experiencing significant harm from [his] placement," *id.* at 2, counsel would be well advised to consider carefully the full range of options available. *See Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice*, No. 18-5116, 2019 WL 1907230, at *6 (D.C. Cir. Apr. 30, 2019) ("[Plaintiff's] failure to pursue these alternatives causes [his] cries of unfairness to ring hollow.").

previously pled that could cure the deficiencies in the original Complaint." Defs.' Opp'n to Pl.'s

Mot. to Alter or Amend Judgment & Mot. for Leave to File Am. Compl. ("Defs.' Opp'n") at 1,

ECF No. 31. Further, the defendants assert that leave to amend should be denied because

granting that relief now would be both unduly prejudicial and futile, as the Proposed Amended

Complaint fails to cure the deficiencies warranting dismissal in the first place. *Id.* at 6. For the

reasons explained below, Seth's motion is denied.

## II.   LEGAL STANDARD

Rule 59(e) allows a party to file "[a] motion to alter or amend a judgment." FED. R. CIV.

P. 59(e). "A Rule 59(e) motion is discretionary and need not be granted unless the district court

finds that there is an intervening change of controlling law, the availability of new evidence, or

the need to correct a clear error or prevent manifest injustice." *Messina v. Krakower*, 439 F.3d

755, 758 (D.C. Cir. 2006) (quoting *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996)).

As the D.C. Circuit recently stressed, "the reconsideration or amendment of a judgment is

nonetheless an extraordinary measure." *Leidos, Inc. v. Hellenic Republic*, 881 F.3d 213, 217

(D.C. Cir. 2018). A Rule 59(e) motion "may not be used to relitigate old matters, or to raise

arguments or present evidence that could have been raised prior to the entry of judgment," *id.*

(quoting *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008)), and "is 'not a vehicle to

present a new legal theory that was available prior to judgment,'" *id.* (quoting *Patton Boggs LLP

v. Chevron Corp.*, 683 F.3d 397, 403 (D.C. Cir. 2012)). Thus, "Rule 59(e) is not available to a

party who 'could have easily avoided the outcome, but instead elected not to act until after a final

order had been entered.'" *Id.* at 220 (quoting *Ciralsky v. CIA*, 355 F.3d 661, 665 (D.C. Cir.

2004)).

When a Rule 59(e) motion seeks review of dismissal of a complaint, and is accompanied by a proposed amended complaint that purports to cure the deficiency prompting the original dismissal, the proper procedure requires the plaintiff first to "satisfy Rule 59(e)'s more stringent standard," *Firestone*, 76 F.3d at 1208, before Federal Rule of Civil Procedure "15(a)'s liberal standard for granting leave to amend governs," *id.*; *see also Osborn v. Visa Inc.*, 797 F.3d 1057, 1062 (D.C. Cir. 2015) (noting that "[a]s a technical matter, the District Court lack[s] authority to rule on the merits of the Rule 15(a) motion [if] it did not modify its final judgment dismissing [the case]"). At the same time, the D.C. Circuit has instructed that "the Rule 59(e) motion should be granted" "if the dismissal of the complaint with prejudice was erroneous[,] that is, the Rule 59(e) motion should be granted unless 'the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency.'" *Brink v. Cont'l Ins. Co.*, 787 F.3d 1120, 1128 (D.C. Cir. 2015) (quoting *Firestone*, 76 F.3d at 1209).

## III. DISCUSSION

In urging reconsideration under Rule 59(e), Seth argues that dismissal of his complaint with prejudice was erroneous for two reasons. First, he complains that the reasons for dismissing with prejudice were not adequately explained in the 2018 Decision. Pl.'s Mem. at 7–9. Second, he argues that he now possesses "significant evidence" supporting his claims, *id.* at 8, illustrating that he is able to allege "other facts consistent with the challenged pleading," *id.* at 5 (quoting *Firestone*, 76 F.3d at 1209), which facts cure the complaint's prior deficiencies. Each of these arguments is addressed in turn.

### A. Dismissal with Prejudice was Both Warranted and Adequately Explained

According to Seth, the dismissal of his complaint with prejudice must be in error because "the Memorandum Opinion identifies numerous possible areas where additional or other facts could cure the supposed defects in [Seth's] original Complaint." *Id.* at 9. He presses this point

in his reply, which largely consists of tables matching deficiencies identified in the prior ruling with new allegations contained in the Proposed Amended Complaint that purport to address each such deficiency. *See* Pl.'s Reply to Defs.' Opp'n ("Pl.'s Reply") at 6–10, ECF No. 32.

Seth errs in assuming that the recitation in the 2018 Decision of certain facts he failed to elucidate was an indication that such facts could cure the complaint. They cannot. The central reason that his federal and state antidiscrimination claims were dismissed with prejudice is that he could not allege sufficient facts suggesting that he was denied DDS services due to his disability, rather than due to the fact—barely acknowledged in his complaint—that he had been deemed by a federal court, by clear and convincing evidence, to be a danger to the community. *See* 2018 Decision at *11–14. As the defendants argue, this fact, which remains unchallenged in the Eastern District of North Carolina, "undermines any allegation—that was pled or could be pled—suggesting that the District failed to act for plaintiff . . . because he has an intellectual disability." Defs.' Opp'n at 5 (internal quotation marks and citation omitted). The emphasis, in the original ruling, on the dangerousness finding by the warden at FMC Butner and by the Eastern District of North Carolina offered sufficient explanation why "the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency" in the complaint, and therefore provided sufficient explanation as to why the federal and state antidiscrimination claims were dismissed with prejudice. *See Firestone*, 76 F.3d at 1209 (internal quotation marks and citation omitted); *He Depu v. Yahoo! Inc.*, 334 F. Supp. 3d 315, 321 n.8 (D.D.C. 2018) ("[T]he amended allegations must be consistent with plaintiffs' pleading, not with issues noted by the Court.").

The dangerousness finding was also the foundation for the dismissal with prejudice of Seth's unjustified isolation claim. *See* 2018 Decision at *14. In light of the Eastern District of

North Carolina's finding, by clear and convincing evidence, that Seth's release to the community

would pose a substantial risk of causing bodily injury and that state placement was not available,

Seth could allege no facts that the state's treatment officials had determined that community

placement was now appropriate or could be reasonably accommodated. *Id.* at *13–14. As noted

in the prior ruling, the Rehabilitation Act does not require that any benefit extended to one

category of handicapped persons be extended to all other categories, *see id.* at *14 (citing

*Traynor v. Turnage*, 485 U.S. 535, 549 (1988)), nor does the IDRA provide for judicial review as

to whether suitable arrangements for state custody are in fact available, *id.* (citing *United States

v. Wigren*, 641 F.3d 944, 946 (8th Cir. 2011)).[2] Notwithstanding Seth's frustration with the

District's refusal to serve him, given the conditional language of the IDRA, the Attorney General

is not required to release a committed person to the District in the absence of the District's

willingness to assume responsibility for that person's custody, care, or treatment, *id.*, and thus

the decision to dismiss Seth's unjustified isolation claim with prejudice was warranted and

adequately explained.

Finally, Seth's CIDA claim was dismissed with prejudice based on the conclusion that no

private right of action in federal court is provided for individuals, such as Seth, who have not

---

[2]     Seth protests that because the District determined in March 2015 that "carefully supervised
community-based services are appropriate," Pl.'s Mem. at 13, the "subsequent decision by DDS not to provide
services to [Seth] is not a determination by DDS sufficient to satisfy the *Olmstead v. L.C. ex rel. Zimring*, 527 U.S.
581 (1999) standard[] that community based services are not 'appropriate,'" *id.* at 13–14. These arguments have
already been rejected, 2018 Decision at *14, and Seth offers no citation to undermine the cases relied upon, such as
*Wigren*, 641 F.3d at 946–47, which held that the IDRA does not provide for judicial review of or establish standards
for determining whether suitable arrangements for state custody are available, nor does it endow the committed
person with a judicially enforceable right to state custody. *See also United States v. Johnson*, 453 F. App'x 664, 667
(8th Cir. 2012) (holding that the government is not required to put on proof on the matter of state custody aside from
the initial certification by the warden). Further, whatever quarrel Seth has with DDS's "unilateral[]" decision that
state placement is not appropriate, Pl.'s Mem. at 14, this assessment was ratified by the Complex Warden at FMC
Butner and the Eastern District of North Carolina. *See* 2018 Decision at *6 (noting that the Eastern District of North
Carolina found that "state placement is not available" in the District (quoting Competency H'rg Tr. (May 24, 2018)
at 46:19, *United States v. Seth*, No. 17-hc-2090 (E.D.N.C. June 7, 2018), ECF No. 34)); *id.* at *14 & n.12 ("[T]his
Court would be hard-pressed to order [Seth's] release," which was part of the relief Seth requested in his complaint,
*see* Compl. at 48, "given the finding of dangerousness in the Eastern District of North Carolina.").

been determined intellectually disabled through the process set out in the CIDA and because the CIDA does not obligate the District to petition for Seth's commitment. *See id.* at *15–17. Under the *Cort v. Ash* test, Seth could not establish that the CIDA provided an implied right of action in federal court for individuals who had not been determined by the Superior Court of the District of Columbia to have an intellectual disability, nor could he overcome the discretionary nature of the petition provision in the CIDA, which establishes that the District is not required to file a petition for civil commitment every time an individual is found incompetent in a criminal case. *See id.* at *16–17 (citing *Cort v. Ash*, 422 U.S. 66, 78 (1975)). Seth does not even attempt to offer new evidence consistent with his challenged pleading, relying instead on a new legal argument that the CIDA's legislative history shows that Seth is "one of the class for whose *especial* benefit the statu[t]e was created." Pl.'s Reply at 10–11 (emphasis in original) (citing Proposed Am. Compl. ¶¶ 141, 144 (discussion of the Committee Report for 2002 amendments to the CIDA)). By contrast, Seth's memorandum in opposition to the defendants' motion to dismiss his original complaint argued that "[t]here is no need to look to the Committee Report to discern CIDA's purpose." Pl.'s Mem. in Opp'n to Defs.' Mot. to Dismiss at 31, ECF No. 21. The legislative history Seth now relies on addresses only one of the relevant *Cort v. Ash* prongs and, in any event, is consistent with this Court's conclusion that the CIDA's legislative history indicates that this local statute only affords rights to those determined to be intellectually disabled after a petition is filed in Superior Court. *See* 2018 Decision at *16. Thus, Seth's CIDA claim "suffers the same legal deficiency that existed in the [original] Complaint." Defs.' Opp'n at 10. Seth's attempt to relitigate his CIDA claim demonstrates that he cannot allege additional facts consistent with the challenged pleading, and therefore dismissal with prejudice was appropriate.

**B.      Seth's "New" Evidence Demonstrates that Reconsideration is Not Warranted**

Consideration of the new factual allegations proffered by Seth only reinforces the conclusion that dismissal with prejudice was appropriate in the first place and that reconsideration is not warranted now.  "[R]econsideration is only appropriate when 'the moving party shows new facts or clear errors of law which compel the court to change its prior position.'"  *Carter v. Wash. Metro. Area Transit Auth.*, 503 F.3d 143, 145 n.2 (D.C. Cir. 2007) (quoting *Nat'l Ctr. for Mfg. Scis. v. Dep't of Def.*, 199 F.3d 507, 511 (D.C. Cir. 2000)). Reconsideration motions may not be used to "relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment."  *Exxon Shipping Co.*, 554 U.S. at 485 n.5 (internal quotation marks and citation omitted).  In other words, the evidence presented in a reconsideration motion must be "newly discovered or previously unavailable despite the exercise of due diligence."  *Johnson v. District of Columbia*, 266 F. Supp. 3d 206, 211 (D.D.C. 2017) (internal quotation marks and citation omitted).  "Courts routinely deny Rule 59(e) motions where all relevant facts were known or should have been known by the party prior to the entry of judgment."  *Id.*; *see also SEC v. Bilzerian*, 729 F. Supp. 2d 9, 15 (D.D.C. 2010) (denying Rule 59(e) motion where "new evidence" was "not newly available; it is simply newly received").

Seth's new factual allegations were neither unavailable, within the meaning of Rule 59(e), prior to entry of judgment, nor are they sufficient now to compel a different result.  He protests that "some" of the additional evidence he wishes to offer was "unavailable at the time this action was *initiated*," Pl.'s Reply at 1 (emphasis added), but that is not the governing standard under Rule 59(e), which asks whether the evidence could have been raised *"prior to the entry of judgment*," *Exxon Shipping Co.*, 554 U.S. at 485 n.5 (emphasis added).  Although Seth insists that it "should come as no surprise" that he "continued to identify evidence and witnesses

while litigating the motion to dismiss," Pl.'s Reply at 12, he fails to explain why either his continued investigation or the defendants' motion to dismiss never prompted him to move to amend the complaint *prior* to entry of the judgment, either as of right under Federal Rule of Civil Procedure 15(a)(1)(B), or with the consent of the party or judicial approval under Federal Rule of Civil Procedure 15(a)(2). *See* Defs.' Opp'n at 6–7 (noting this lack of explanation).

Regardless, Seth's proffered evidence, even if deemed "previously unavailable despite the exercise of due diligence," *Johnson*, 266 F. Supp. 3d at 211, does not "compel the court to change its prior position," *Carter*, 503 F.3d at 145 n.2. First, the 2018 Decision critically assessed Seth's allegation regarding DDS "utilizing criteria or methods of administration" for its services, which criteria allegedly "have the effect of subjecting [Seth] to discrimination on the basis of disability," Compl. ¶ 133, for not "provid[ing] . . . further details on these criteria, how they affected him, or the defendants' motivations for imposing such criteria." 2018 Decision at *11. To address this criticism, Seth alleges that he can now present "statements made in communications by DDS employees creat[ing] a strong inference that their motivation was to discriminate against [Seth]." Pl.'s Mem. at 10. As support, Seth points to a single email communication from a DDS employee in 2015 indicating that DDS wanted "to leave as small a footprint as possible" in committing Seth, *see* Pl.'s Reply at 6 (citing Proposed Am. Compl. ¶¶ 127, 128), which Seth interprets to "reflect[] both DDS's willingness in 2015 to civilly commit [Seth] and its simultaneous preference that others remain unaware of this action . . . evidencing DDS's bias against serving individuals with intellectual disability," Proposed Am. Compl. ¶ 128. According to Seth, this email, together with evidence that the District provides community-based services to individuals with mental illness who are dangerous and has the capacity of serving individuals such as Seth who have an intellectual disability and are dangerous, is sufficient to

create an inference that the District's ultimate refusal to accept responsibility for Seth was motivated by discrimination on the basis of his intellectual disability. Pl.'s Mem. at 10; Pl.'s Reply at 6–8.

Although, at the motion-to-dismiss stage, the complaint's factual allegations and reasonable inferences to be drawn from those facts are assumed to be true, *Niskey v. Kelly*, 859 F.3d 1, 5 (D.C. Cir. 2017), Seth still offers insufficient facts to support a reasonable inference that a desire "to leave as small a footprint as possible" in providing community-based services to a man accused of sexual activities with children reflects discrimination on the basis of Seth's disability, as opposed to common-sense concerns about the community's possible reaction to Seth's potential (later confirmed) dangerousness. *See Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 69 (D.C. Cir. 2015) (a claim may be rendered plausible when the facts alleged in the complaint eliminate other, legitimate reasons and thus lead to a reasonable inference of discrimination).[3]

---

[3] Seth posits that "it does not take much pleading to withstand a motion to dismiss in the discrimination context," Pl.'s Reply at 4 (internal quotation marks and alteration omitted) (quoting *Brown v. District of Columbia*, No. 16-cv-0947 (EGS), 2017 WL 4174417, at *2 (D.D.C. Sept. 18, 2017)), citing a refrain from a racial discrimination case holding that "'I was turned down for a job because of my race' is all a complaint has to say to survive a motion to dismiss," *id.* (quoting *Sirmans v. Caldera*, 138 F. Supp. 2d 14, 21 (D.D.C. 2001) (internal citation omitted)). *Sirmans*, which is not binding on this Court, was decided before *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), which are. *See Sirmans*, 138 F. Supp. 2d at 21 (citing *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957)). In any event, the cases Seth relies on, such as *Brown*, which involved a *pro se* plaintiff, whose pleadings are provided more leeway, 2017 WL 4174417, at *2, or *Alston v. District of Columbia*, 561 F. Supp. 2d 29, 39 (D.D.C. 2008) (cited at Pl.'s Mem. at 7 n.2), are distinguishable. Indeed, Seth has been warned previously that "*Alston*'s continuing guidance regarding the analysis of a motion to dismiss is . . . questionable" since it was decided before the Supreme Court's decision in *Iqbal*. *See* 2018 Decision at *13 n.11. Regardless, unlike plaintiffs who may be able to "state a facially plausible claim," *Rudder v. Williams*, 666 F.3d 790, 794 (D.C. Cir. 2012), without reference to anticipated justifications or defenses, *see Alston*, 561 F. Supp. 2d at 39 ("There is no mention in the complaint of any causes other than the 'extent and severity of her disabilities.'"), Seth must, even in his complaint, acknowledge the dangerousness certification at FMC Butner and the dangerousness finding in the Eastern District of North Carolina. These legitimate, non-discriminatory reasons for the DDS's actions, together with Seth's failure to allege sufficient facts demonstrating that DDS's actions were nonetheless taken because of his disability, supported dismissal with prejudice in the first instance, and support denial of the motion to alter or amend the judgment now.

Second, in response to the 2018 Decision's footnote that Seth had utterly failed to develop any legal theory distinguishing Seth's intellectual disability from mental illness as the "crux" of his discrimination claims, *see* 2018 Decision at *12 n.9, Seth says that he can offer evidence "show[ing] that Defendants have a track record of providing similar services to individuals with behaviors similar to his own but who have different disabilities." Pl.'s Mem. at 10. As support, he alleges that the defendants "filed more than 40 petitions to civilly commit individuals found not competent to stand trial as a result of mental illness, while . . . avoid[ing] civilly committing and serving people with intellectual disability under similar circumstances." *Id.* at 15; *see also* Pl.'s Mot. at 2–3 (citing the District's practice of "regularly" seeking to civilly commit individuals with mental illness "who are determined incompetent and dangerous" under the Ervin Act, D.C. CODE §§ 21-501, *et seq.*, while "refus[ing] to serve people with intellectual and developmental disabilities in the same situation," under the CIDA). Seth suggests that this data supports a disparate impact theory, apparently because he "identif[ies] a specific practice that, while facially neutral, nonetheless had a disproportionate adverse effect on a protected class of individuals." Pl.'s Reply at 7 (quoting 2018 Decision at *12 (quoting *Anderson v. Duncan*, 20 F. Supp. 3d 42, 54 (D.D.C. 2013) (internal quotation marks and alteration omitted))).

Seth notes discrepancies between the number of individuals served by the Ervin Act and the CIDA, but offers no evidence suggesting that "the practice in question caused individuals to suffer the offending adverse impact because of their membership in a protected group." *Anderson*, 20 F. Supp. 3d at 54 (quoting *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 994 (1988) (internal quotation marks and alterations omitted)). Although individuals served by the Ervin Act have mental illness, whereas those served by the CIDA have intellectual or developmental disabilities, this is not the only distinction among the populations. *See Heller v.*

*Doe*, 509 U.S. 312, 322–24 (1993) (concluding that a state had a rational basis for requiring a lower standard of proof for commitments for "mental retardation" than for mental illness, as "mental retardation is easier to diagnose" and "[m]ental retardation is a permanent, relatively static condition . . . so a determination of dangerousness may be made with some accuracy based on previous behavior").  Seth states that "[u]pon information and belief, in just the last fiscal year, 40 Ervin Act petitions seeking civil commitment of incompetent defendants with mental illness were filed," Proposed Am. Compl. ¶ 116, compared to only two petitions filed under the CIDA in the last seven years, *id.*, yet he provides no further citation for this information, or any way to compare commitments under the Ervin Act and the CIDA with an estimated population of defendants with mental illness compared to defendants with intellectual disabilities.  *See Anderson*, 20 F. Supp. 3d at 54 (a *prima facie* case of disparate impact requires "statistical evidence of a kind and degree sufficient to show that the practice in question caused" adverse impact because of membership in a protected group (internal quotation marks and citations omitted)).  Notably, the Ervin Act provides a process for the involuntary commitment of individuals with mental illness who, because of their mental illness, are found "likely to injure [themselves] or other persons if not committed," even if that person has not been arrested in connection with a criminal case, D.C. CODE § 21-541(a), whereas the CIDA was recently amended to prohibit new commitments *other* than commitments of persons found incompetent in a criminal case.  *See* D.C. CODE §§ 7-1303.04; 7-1303.12a(a); Proposed Am. Compl. ¶ 141 n.15; Disability Services Reform Amendment Act of 2018, D.C. Act 22-227 (2018).  These differences among the Ervin Act and the CIDA require more than surface-level statistics comparing commitments under the two acts, which serve different populations, of different sizes, with potentially different levels of immediate risk to the public.  Seth's statistics are therefore

inadequate to "show that the practice in question caused individuals to suffer the offending adverse impact because of their membership in a protected group." *Anderson*, 20 F. Supp. 3d at 54 (internal quotation marks and alternation omitted); *see also Figueroa v. Tillerson*, 289 F. Supp. 3d 212, 230 (D.D.C. 2018) (without proper statistical analysis, "the Court has no basis on which to assess whether any disparity . . . may be caused by the challenged [practice] rather than the randomness of chance, the overall small number of [members of the protected class], or some other factor"); Defs.' Opp'n at 8 ("[P]laintiff's comparison is unavailing because he attempts to compare distinct populations and commitments that are governed by differing statutes.").

Third, Seth argues that the defendants "were fully aware of [Seth's] potential dangerousness throughout the planning process [so] their decision not to initiate commitment and custody proceedings was not premised on the FMC Butner's Warden's Certificate of Dangerous[ness] filed on April 28, 2017." Pl.'s Mem. at 13. He notes that in May 2017, a month after the dangerousness certificate and a year before the Eastern District of North Carolina commitment proceeding, DDS communicated that "the idea is to get [Seth] out of confinement as soon as possible within the timing realities of the two commitment processes." *Id.* (quoting email communications between DDS and Seth's counsel). Indeed, Seth cites former DDS Director Nuss for the proposition that "there would be no need or basis for civil commitment in the absence of a dangerousness finding." Pl.'s Mot., Ex. 1, Decl. of Laura L. Nuss ("Nuss Decl.") at ¶ 6, ECF No. 29-2. This background, Seth argues, "create[s] a strong inference that DDS's ultimate failure to serve [Seth] was not because of the charges against [him] or his potential dangerousness but was instead discrimination against [Seth] due to his intellectual disability." Pl.'s Mem. at 13.

Seth's evidence of DDS's planning process offers nothing to contradict the history already recounted in the 2018 Decision, which noted that the District and Seth's attorneys had been discussing and planning for Seth's eventual commitment since at least February 2015, a process that entailed multiple assessments of Seth's competency and potential risk to the community. 2018 Decision at *4–6. The 2018 Decision also acknowledged that dangerousness was a consideration for the District in determining whether to exercise discretion to seek a civil commitment. *See id.* at *16 (citing the Committee Report for an amendment to the CIDA, the Civil Commitment of Citizens with Mental Retardation Amendment Act of 2002, D.C. Bill 14-616, which explained that the purpose of the Act was to "ensure public safety and protect the community from individuals who may be dangerous to others without treatment or supervision" (internal quotation marks and citation omitted)). What Seth once again fails to grapple with is that planning for responsibility for an individual whose "potential dangerousness" is known, Pl.'s Mem. at 13, is not equivalent to planning for responsibility for an individual who has been declared, by clear and convincing evidence, to pose a substantial risk of injury to the community. Seth attempts to argue that his "potential dangerousness" was a constant throughout DDS's consideration of his placement in order to draw the inference that the District's action (or inaction) can only be explained as discrimination on the basis of his intellectual disability. He has it exactly backwards. Seth's intellectual disability was a constant; what changed was the certainty of his dangerousness. In light of Seth's failure, once again, to offer facts supporting an inference that DDS's ultimate refusal to exercise its discretion to file a petition for his civil commitment was an action taken on the basis of his disability, his "new evidence" on this front offers no reason to alter or amend the judgment.

Fourth, Seth avers that "publicly available budget data shows DDS's budget allocations have increased year over year every year since 2016, and . . . at no time during the relevant time period has DDS had a waiting list for its services." *Id.* at 15; *see also* Nuss Decl. at ¶ 5 (noting that the District is required to provide services to all individuals who are eligible for services under a waiver program and that there was a funded slot available when Seth was found eligible for DDS services). This data, according to Seth, rebuts the 2018 Decision's finding that his original complaint "offers no reason to think that [DDS's] change [of position regarding Seth's care] was made by reason of his disability, rather than, for example, budgetary choices made by the new leadership or FMC Butner's Certificate of Dangerousness." 2018 Decision at *12. This data was neither unavailable within the meaning of Rule 59(e) prior to the entry of judgment nor does it compel a different outcome. Even without any budgetary strain, Seth has failed to offer evidence supporting an inference that DDS's refusal to accept responsibility for Seth's care was because of his disability, as opposed to concerns—which may not have been alleviated by budget increases Seth cites—shared by new leadership in light of Seth's dangerousness finding.

Finally, Seth offers to present new allegations and declarations "from former high-level public officials . . . who explain that the District has public systems capable of serving [him] safely in the community. . . . [and that Seth] is not only an excellent candidate for community-based placement but that incarcerating him indefinitely in a corrections facility unequipped to meet his unique needs is extremely harmful to his well-being." Pl.'s Mem. at 15. Even though Seth has not established that he now possesses evidence that was unavailable prior to the entry of judgment, the supporting exhibits and declarations he proffers in support of reconsideration have been carefully considered, including the statement from Nuss, the former director of DDS, that based on her knowledge "the decision by DDS to allow [Seth] to languish and regress in federal

custody rather than carry out its mission and mandate remains inexplicable other than as a matter of discrimination and refusal to alter a usual way of working in order to accommodate an individual's needs."  Nuss Decl. ¶ 24.  Seth's situation remains undeniably troubling, 2018 Decision at *1, and may even raise questions about the Attorney General's compliance with the statutory obligation to encourage the District to accept responsibility for Seth's care, *id.* at *14 n.12 (citing the Attorney General's obligation, under 18 U.S.C. § 4246(d), to "continue periodically to exert all reasonable efforts to cause [the] State to assume . . . responsibility for the person's custody, care, and treatment").  Yet, no evidence Seth now offers changes the conclusion in the 2018 Decision that Seth has failed to show that DDS's refusal to serve him was an action taken "at least in part 'because of,' not merely 'in spite of' its adverse effects upon an identifiable group."  *Pers. Adm'r of Mass v. Feeney*, 442 U.S. 256, 279 (1979).  Despite Nuss's experience and declarations, her inference of discrimination is "unsupported by the facts set out in the complaint."  *Attias v. Carefirst, Inc.*, 865 F.3d 620, 627 (D.C. Cir. 2017) (internal quotation marks and citation omitted).  *See also* Defs.' Opp'n at 9 ("[O]ne agency director's willingness to accept responsibility for a dangerous individual does not mean a subsequent director's unwillingness to do so *must have been* motivated by discriminatory animus; plaintiff is demanding an inference [of discrimination] that does not logically follow the facts pled." (emphasis in original)).

Seth, in an attempt to show that he was discriminated against on the basis of his disability, continues to overlook and minimize an inescapable fact about his particular disability: he was found "by clear and convincing evidence," to be "suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to the property of another."  E.D.N.C. Commitment Order at 1.  It is

*because of* that substantial risk, and the District's refusal to exercise its discretion to commit him, that he was committed to the care of the Attorney General.  Seth has tried valiantly to cobble together facts supporting an inference that DDS refused to provide him care because of his disability, as opposed to because of his dangerousness, but he has once again failed to do so. "To survive a motion to dismiss, [plaintiff] must allege in [his] complaint 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'  In other words, [plaintiff] must do more than allege 'facts that are merely consistent with a defendant's liability' or raise only 'a sheer possibility that a defendant has acted unlawfully.'"  *Citizens for Responsibility & Ethics in Wash.*, 2019 WL 1907230, at *4 (internal quotation marks and citations omitted) (quoting *Iqbal*, 556 U.S. at 678).  Even taking Seth's "new evidence" into account, he fails to state a claim for relief that would survive a motion to dismiss, and therefore his motion to amend or alter the judgment must be denied.

### C.    Even if Reconsideration Were Warranted, Leave to Amend Would Be Futile

"Federal Rule of Civil Procedure 15(a) provides that leave to amend shall be 'freely give[n]' when 'justice so requires.'  But after entry of judgment, a court has no obligation to grant leave to amend unless a plaintiff first satisfies 'Rule 59(e)'s more stringent standard for setting aside that judgment.'"  *Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 17 (D.C. Cir. 2015) (alteration in original) (quoting *Ciralsky*, 355 F.3d at 673).  Where the plaintiff fails to meet this "stringent standard," the motion for leave to file an amended complaint is properly denied as moot.  *See id.* at 18 (citing *Ciralsky*, 355 F.3d at 673); *Osborn*, 797 F.3d at 1062 ("As a technical matter, the District Court lack[s] authority to rule on the merits of [a] 15(a) motion [when] it [does] not modify its final judgment.").  Seth's failure to meet the stringent Rule 59(e) standard is sufficient reason to deny his motion for leave to amend under Rule 15(a).

Nevertheless, "even if [Seth had established that] dismissal with prejudice was error, the remedy at this point would be to grant reconsideration, dismiss without prejudice, and allow [Seth] to amend his Complaint." *Strumsky v. Wash. Post Co.*, 922 F. Supp. 2d 96, 106 (D.D.C. 2013). Yet, as noted, *supra* Section III.B, evaluation of the Proposed Amended Complaint confirms that even if the motion to alter or amend the judgment were granted, this case would not survive a motion to dismiss, and thus granting leave to file an amended complaint "would appear to be an 'empty exercise' in which courts are not required to engage." *Strumsky*, 922 F. Supp. 2d at 106 (quoting *Norman v. United States*, 467 F.3d 773, 775 (D.C. Cir. 2006)); *see also Confederate Mem'l Ass'n, Inc. v. Hines*, 995 F.2d 295, 299 (D.C. Cir. 1993) ("[T]he law does not require the doing of vain things."). Under Rule 15, a motion to amend may be denied "on grounds of futility where the proposed pleading would not survive a motion to dismiss." *In re Interbank Funding Corp. Sec. Litig.*, 629 F.3d 213, 215 (D.C. Cir. 2010). For the reasons discussed above, the "new" facts Seth alleges fail to cure the deficiencies in his complaint, and therefore granting leave to amend would be futile.

## IV. CONCLUSION

For the foregoing reasons, Seth's Motion to Alter or Amend Judgment and Motion for Leave to File Amended Complaint, ECF No. 29, is DENIED. An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date: May 8, 2019

_____
BERYL A. HOWELL
Chief Judge